*PREVIOUSLY FILED WITH THE COURT
SECURITY OFFICER AND CLEARED
FOR PUBLIC FILING ON AUG. 1, 2008*

David L. Engelhardt (DC429886)
John C. Snodgrass (DC473864)
Lisa M. Kaas (DC492302)
Erin C. Wilcox (DC982059)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Tel. (202) 420-2200
Fax (202) 420-2201

*Counsel for Petitioner Salah Ali Abdullah
Ahmed Al Salami, ISN 693*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| IN RE: | ) |
| | ) |
| | ) **Misc. No. 08-0444 (TFH)** |
| **PETITIONERS SEEKING HABEAS** | ) |
| **CORPUS RELIEF IN RELATION TO** | ) **Civil Action No. 05-2452 (PLF)** |
| **PRIOR DETENTIONS AT** | ) |
| **GUANTANAMO BAY** | ) |
| | ) |

---

## RESPONSE TO ORDER TO SHOW CAUSE

Counsel for petitioner Salah Ali Abdullah Ahmed Al Salami (ISN 693) hereby submit

this response to the Court's Order[1] of July 2, 2008 to show cause why this action should not be

dismissed as moot.  Counsel for petitioner respectfully submit that, despite the death of

petitioner, issues remain that this Court can and should resolve.

## INTRODUCTION

The Court should decline to dismiss this petition as moot for two reasons.  First, the

circumstances of the instant petition present what appears to be a novel issue that this Court

should address in the interests of justice.  Respondents have not "produced the body" sufficiently

to moot this habeas proceeding.  Respondents retain important parts of petitioner's body

---

[1] Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 54 (July 2, 2008).

collected during the U.S. military's autopsy thereof.  Nor is this petition of the type that typically becomes moot upon death of the petitioner, such as when petitioner is a former prisoner seeking to overturn a wrongful conviction that negatively impacts his life after release, or when petitioner suffers an *explainable* death while challenging his unlawful detention.  Here, Petitioner died, in suspicious and unverifiable circumstances, after being held for years without charge in the custody that was being challenged, and respondents, who claim to have completed their investigation into petitioner's death – an alleged suicide that they characterized as an act of "asymmetric warfare"[2] – have refused to release any information about that investigation and indeed still retain, and refuse to share, key evidence.  That evidence includes certain organs and tissues of petitioner – *i.e.*, part of his body or "*corpus*" – essential to a medicolegal determination of the cause and manner of death.  This Court can and should, at a minimum, order the remainder of petitioner's body released.  Counsel is aware of no authority requiring dismissal of a habeas petition in the unique circumstances presented here.

Second, courts have recognized an exception to the mootness doctrine in cases where there exist issues of substantial public importance or great public interest.  There can be no doubt that the real story behind the first deaths of detainees (three died that day) in U.S. military custody at Guantánamo Bay is of tremendous concern to the American public, to the families of the men who died, and indeed, to the entire international community.  If the instant petition is dismissed as moot, the Court may effectively foreclose access to the truth about what happened.[3]

---

[2] *See* Sgt. Sara Wood, *Three Guantánamo Bay Detainees Die of Apparent Suicide*, Am. Forces Press Serv. (June 10, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx?id=16080 (last visited July 24, 2008) (quoting Navy Rear Adm. Harry B. Harris); *see also* U.S. Department of Defense News Transcript, June 20, 2006: Radio Interview with Deputy Assistant Secretary Stimson on the Washington Post Radio, 1500 AM, 107.7 FM, Washington D.C., at 2.

[3] On June 14, 2007, counsel for petitioner filed a Freedom of Information Act ("FOIA") request with the Department of Defense seeking information concerning the detention and death of Al

DSMDB-2475905v02

## BACKGROUND

Petitioner Salah Ali Abdullah Ahmed Al Salami, a Yemeni national, died while in U.S. custody at Guantánamo Bay on or around June 10, 2006, purportedly by suicide. During petitioner's imprisonment at Guantánamo, counsel and petitioner's family received no information about petitioner's status or the reasons for his detention. The government never filed a factual return. No Combatant Status Review Tribunal ("CSRT") records that can be linked to petitioner have been produced, and an undated one and one-half page Summary of Administrative Review Board[4] Proceedings for an unnamed detainee listed only as "ISN 693" cannot be definitively identified with petitioner (it reflects that the detainee in question was not even in attendance), describes no charges against the detainee, and provides no information about the reasons for his detention.[5] Counsel never got a chance to meet with petitioner. He died at the very time counsel was making arrangements to visit the base, less than a month after

---

Salami. To date, no documents or information have been produced in response to that FOIA request, despite the government's representation that the investigation into petitioner's death has officially closed. (*See* Stipulated Mot. For Extension of Time, *Dickstein Shapiro LLP v. Department of Defense, et al.*, No. 1:08-cv-226-PLF, ¶ 2 (D.D.C. June 12, 2008).) Earlier this year, counsel filed a FOIA action in this Court, *Dickstein Shapiro LLP v. Department of Defense, et al.*, No. 1:08-cv-226-PLF (D.D.C. filed Feb. 11, 2008), which was designated as a related case to the instant habeas proceeding. The Court has ordered defendants to file a dispositive motion on or before August 15, 2008. (Minute Order, *Dickstein Shapiro LLP v. Department of Defense, et al.*, No. 1:08-cv-226-PLF (D.D.C. June 13, 2008). Counsel for petitioner expects defendants in the FOIA action to resist producing the requested records.

[4] The Administrative Review Board or "ARB" "process" purportedly is designed "to assess annually the need to continue to detain each enemy combatant," and at which the detainee may "explain why he is no longer a threat to the United States and its allies." Order, Administrative Review Procedures for Enemy Combatants in the Control of the Department of Defense at Guantanamo Bay Naval Base, Cuba (May 11, 2004), *available at* http://www.defenselink.mil/news/May2004/d20040518gtmoreview.pdf (last visited July 24, 2008).

[5] *See* attached Ex. 1.

DSMDB-2475905v02

DOJ informed counsel they were cleared to do so,[6] and without knowing that his father (and next friend on this petition) had prepared a videotaped message asking him to cooperate with his American attorneys.

After the death of petitioner and the two other detainees who died that day, respondents made statements to the press dismissing the deaths as "clearly planned by the detainees as a way to advance their cause in the war on terror . . . not an act of desperation,"[7] and calling petitioner a "mid- to high-level al Qaeda operative with links to principal al Qaeda facilitators and senior membership."[8] Of course, these unsupported claims cannot be officially confirmed because no ARB or CRST records or evidence summaries readily linked to petitioner contain any information about the reasons for his detention.

Respondents have claimed that petitioner was found hanging in his cell. Following an autopsy by a U.S. military pathologist, the shell of petitioner's body (less a number of organs and tissues) was returned to Yemen five days later and identified by next of kin. Petitioner's father vehemently disputes that his son would have committed suicide, which is viewed as sacrilege in Islam.[9]

---

[6] Email from Andrew Warden, U.S. Dept. of Justice, to John Snodgrass, Dickstein Shapiro LLP (May 16, 2006) (stating that "you have satisfied the requirements for privileged access to petitioner Al Salami") (attached hereto as Ex. 2).

[7] Sgt. Sara Wood, *Three Guantánamo Bay Detainees Die of Apparent Suicide*, Am. Forces Press Serv. (June 10, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx? id=16080 (last visited July 24, 2008) (citing Navy Rear Adm. Harry B. Harris).

[8] Sgt. Sara Wood, *DoD Identifies Guantanamo Detainee Suicides*, Am. Forces Press Serv. (June 12, 2006), *available at* http://www.defenselink.mil/news/newsarticle.aspx?id=16072 (last visited July 24, 2008).

[9] *See Family Disputes Guantanamo Suicide*, Aljazeera.net (June 14, 2006), attached as Ex. I to Emergency Mot. For Preservation Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 17 (June 19, 2006) (quoting petitioner's father: "This idea of suicide is a lie. My son wouldn't commit suicide. My son was among those who memorised the Quran and was

DSMDB-2475905v02

Respondents never have released the results of the autopsies or the investigation into the death of petitioner on that June day more than two years ago.[10]  A second, independent autopsy of petitioner's body was performed in Yemen by a team of pathologists led by the chief of the Institute of Legal Medicine of Lausanne University; however, because certain key organs and tissues – including specifically *the larynx, hyoid bone, and thyroid cartilage*, some or all of which uniquely can permit a pathologist to distinguish between hanging and manual strangulation (*i.e.*, homicide) – were not returned with the body, the results of this second autopsy were inconclusive.[11]  The international human rights organization that coordinated this second autopsy attempted to obtain answers to the questions raised by the second autopsy from respondents' military pathologist,[12] but received no reply.[13]  On information and belief,

---

committed to his religion.  . . . He was assassinated by American soldiers and I call on the Yemeni and American governments for an international investigation.").

[10] Shortly after learning of petitioner's death, counsel for petitioner moved the Court for an emergency order to preserve evidence relating to petitioner's detention and death.  Emergency Mot. for Preservation Order, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 17 (June 19, 2006).  The Court never ruled on that motion.

[11] Nor were and the nail clippings from petitioner's fingers and toes returned, which could contain trace evidence showing that he had scratched an attacker in self defense, for example.  *See* Letter from Rachid Mesli, Legal Director, Alkarama for Human Rights, to Dr. Craig T. Mallak, Armed Forces Medical Examiner (June 29, 2006) (attached hereto as Ex. 3).  On information and belief, the same critical samples were retained by U.S. authorities in the cases of the two other detainees who died on June 10, 2006.

[12] In a letter to Armed Forces Medical Examiner Dr. Craig T. Mallak of June 29, 2006, the Legal Director of Geneva-based Alkarama For Human Rights sought to establish communication between Dr. Mallak and the team of pathologists who conducted the second autopsy of petitioner's body in Yemen, stating that the team "needs some documents, materials and explanations from your side in order for them to finalize their report of autopsy" and requesting, among other things, the rest of petitioner's organs and tissues and the report of the investigation at Guantánamo, including the circumstances of discovery of petitioner's body, the exact nature of the ligatures purportedly used, whether and what reanimation measures were taken, photographs, and records pertaining to petitioner's emotional state.  Not surprisingly, no response was received.

DSMDB-2475905v02

respondents remain in possession of the numerous parts of petitioner's body[14] that were missing

upon its return to Yemen, and they therefore hold the key that would unlock the truth about the

circumstances of petitioner's death.

## DISCUSSION

I.      <u>The Standard For Dismissal On Grounds Of Mootness</u>

The doctrine of mootness derives from Article III, § 2, of the Constitution, which

requires the existence of a "case or controversy" for federal jurisdiction to lie.  *E.g.*, *Spencer v.*

*Kemna*, 523 U.S. 1, 7 (1998); *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964).  In addition to

Article III, discretionary components of the doctrine have developed, based upon concerns of

remedial utility and judicial administration.  But, even within the federal courts' Article III

decisions, there is flexibility in the application of the mootness doctrine.  *See* 13A Wright, Miller

& Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.1.  In fact, most decisions

focus on the court's "ability to provide any presently meaningful remedy."  *Id.*  At the core of the

various components of the mootness doctrine "is a search for the possibility that granting a

present determination of the issues offered, and perhaps the entry of more specific orders, will

have some effect in the real world."  *Id.*

Mootness issues that arise in cases such as this, where events or changed

circumstances overtake the pace of adjudication, typically compel a "highly individualistic, and

usually intuitive, appraisal of the facts of each case."  *Id.* § 3533.  In addition to revolving around

---

[13] Adam Beaumont, *Doubt Cast Over Guantanamo "Suicides,"* swissinfo (Mar. 2, 2007), available at http://www.swissinfo.org/eng/swissinfo.html?siteSect=43&sid=7581369 (last visited July 24, 2008) (attached hereto as Ex. 4).

[14] The report of the second autopsy of petitioner's body (original and English translation attached hereto as Exs. 5 and 6, respectively) lists as missing or not identifiable the following organs: larynx and pharynx, thyroid cartilage, hyoid bone, upper section of the trachea, part of the neck musculature, cervical ganglions, esophagus, renal lodges, mesentery, suprarenals, pancreas, gall bladder, prostate, testicles, appendix, and pituitary gland.

DSMDB-2475905v02

specific facts, the mootness inquiry may be "shaped by the desire to decide, or to avoid deciding, difficult issues or matters that seem affected with a public interest," thus defying any attempt to force the analytic steps into neatly carved boxes.  *Id.*  The central theme of cases in which mootness was rejected because something remained that the court could accomplish – regardless of the specific facts and rationale – is that "decision should not be denied if a *worthwhile remedy* can be given."  *Id.* § 3533.3 (emphasis added).  Thus, the Court's assessment here should turn on the general policy of granting *effective relief* whenever the Court can do so.

A.    Mootness In The Context Of Habeas Corpus

Although the Great Writ of habeas corpus historically was an instrument to secure production of "the body" of the petitioner before a tribunal to test the legality of detention, *see, e.g.*, *Carafas v. LaVallee,* 391 U.S. 234, 238 (1968), the federal habeas statute contemplates the existence of some "other remedy" besides the petitioner's presentation or release.  The statute broadly describes the relief that may be granted, requiring the courts to "summarily hear and determine the facts, and dispose of the matter *as law and justice require*."  28 U.S.C. § 2243 (emphasis added); *Carafas*, 391 U.S. at 239 (noting that the 1966 amendments to the statute contemplate the potential of relief other than release from custody); *Sanders/Miller v. Logan*, 710 F.2d 645, 656 (10th Cir. 1983) (holding habeas suit not mooted by parole, and remanding for vacation of conviction and "any further relief which law and justice require on further consideration of the cause by the district court").

This flexibility is exemplified by a decision of the D.C. Circuit, in a habeas proceeding brought by a petitioner who, following his conviction and confinement for robbery, was transferred from Lorton prison to the D.C. jail, while his appeal from a rejected petition was pending in the Fourth Circuit.  Petitioner alleged that the government transferred him to thwart his appeal).  The D.C. Circuit held that the appeal was not mooted by this illegal transfer and

7

continued, "whatever grounds there may have been for the transfer . . . [i]t is not too much to require that [respondent/appellee corrections officials] justify their course." *Bolden v. Clemmer*, 298 F.2d 306, 309 (D.C. Cir. 1961) (noting that the district courts have the "power in a habeas corpus proceeding to dispose of the matter as the law may require"). Suspicious of the reasons behind the transfer, the Court in that case was willing to entertain relief other than the traditional presentation or release of petitioner, implying that petitioner should promptly be returned to Lorton. *Id.*

Several years later, in *Carafas v. LaVallee*, the Supreme Court made clear that a habeas petition is not rendered moot by the petitioner's release from custody. 391 U.S. at 238 (holding that the "in custody" requirement of 28 U.S.C. § 2254 is determined at the time the petition is filed). Where a habeas petitioner who was in custody at the time of filing his petition is no longer in custody, and seeks to show that subsequent release has not rendered his petition moot, he must demonstrate that he continues to present a "case or controversy" for the court to decide. *E.g.*, *Qassim v. Bush*, 466 F.3d 1073, 1078 (D.C. Cir. 2006), *citing Zalawadia v. Ashcroft*, 371 F.3d 292, 297 (5th Cir. 2004); *Kemplen v. Maryland*, 428 F.2d 169, 171 (4th Cir. 1970) (holding habeas petition not moot where petitioner was released from custody but stigmatized; "the result that we reach today will apparently mean something to the petitioner and will be more than a mere exercise in judicial futility"). While a number of courts have had occasion to consider the survival of habeas petitions following the death of the petitioner, typically finding such cases to be moot,[15] none appear to have considered a death in the unique circumstances presented here.

---

[15] *See, e.g.*, *Brooks v. Estelle*, 702 F.2d 84 (5th Cir. 1983) (petition moot after death sentence carried out); *Hann v. Hawk*, 205 F.2d 839 (8th Cir. 1953) (petitioner died before decision on appeal by warden; appeal concerning legality of petitioner's release from state prison in habeas

DSMDB-2475905v02

**II.      This Case Is Not Moot Because Respondents Still Retain A Portion Of Petitioner's Body**

As explained in more detail *supra*, counsel for petitioner have reason to believe that respondents remain in possession of multiple organs from petitioner's body, including among other things his larynx and pharynx, thyroid cartilage, hyoid bone, upper trachea, and part of his neck musculature.[16]  *See* Exs. 3, 6.  Combined with other evidence apparently withheld by respondents, these organs and tissues are needed to determine how petitioner died.

Because this Court has the power to order the production of petitioner's body via this habeas action, and because significant parts of petitioner's body have yet to be produced, the Court can grant effective relief by requiring respondents, at a minimum, to produce forthwith all organs, tissues, or other anatomical samples taken from petitioner's body.  The Court also could, in the interests of justice, require the production of all evidence and reports relating to respondents' investigation of petitioner's death while in their custody.  Because the Court can provide a remedy that comports with the principles of habeas corpus relief, would finally end the "continuing effects" of petitioner's detention (*i.e.*, by the full and complete repatriation of

---

proceeding was moot); *Parkman v. Harrison*, No. 01-7028, 2002 WL 1461799, at *1 (D.C. Cir. 2002) (no discussion of mootness finding; citing *Hann v. Hawk*); *In re Kravitz*, 504 F. Supp. 43 (M.D. Pa. 1980) (petitioner died while petition pending; neither social stigma of murder conviction nor inability to inherit from victim avoided mootness); *United States ex rel. Schwartz v. Lennox*, 320 F. Supp. 754 (E.D. Pa. 1971) (petitioner died before argument on petition; case was moot where there was no showing that retirement benefits would have been more in absence of conviction; moreover, writ not intended to be used by beneficiaries).

[16] Should respondents dispute this fact, the burden is on them to prove otherwise.  Assuming a dispute over facts, the party claiming mootness bears the burdens of production and persuasion in demonstrating that mootness has in fact occurred.  *See, e.g., Firefighters Local 1784 v. Stotts*, 467 U.S. 561, 569 (1984); *In re Sokolowski*, 205 F.3d 532, 534 (2d Cir. 2000) (debtor claimed automobile creditor's appeal of injunction against repossession was moot because car was no longer in her possession; mootness rejected because debtor "failed to proffer competent evidence to support her claim * * * ").

DSMDB-2475905v02

petitioner's body to Yemen), and would serve the interests of justice, the Court should decline to find this habeas petition moot.

Indeed, a number of courts have held that an action seeking injunctive relief is not mooted by the *partial* completion of an act, the full completion of which could very well moot the case. For example, in *West v. Secretary of Department of Transportation*, the Ninth Circuit considered the mootness of a case seeking to enjoin construction of a highway and to declare that an environmental impact statement was required. Despite the completion of part of the project, the court ruled that worthwhile remedies remained available – for example, the court could address the remainder of the project via injunctive relief. 206 F.3d 920, 924-26 & n.4, 929-30 (9th Cir. 2000) (*quoting* Wright & Miller, 13A Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3533.3: "The central question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief. . . . [C]ourts must be careful to appraise the full range of remedial opportunities."); *see also San Diego Chapter of Surfrider Found. v. Dalton*, 196 F.3d 1057, 1058 n.1 (9th Cir. 1999) (action for injunction not moot where first phase of project complete but second not yet begun). Similarly, the Fifth Circuit declined to dismiss a case as moot that challenged a public housing project under the National Environmental Policy and Historic Preservation Acts, where the redevelopment project was partially complete, but where substantial work that could be addressed by an injunction remained to be done. *Coliseum Square Ass'n v. Jackson*, 465 F.3d 215, 227-28 (5th Cir. 2006), *cert. denied*, 128 S. Ct. 40 (Mem.) (2007). *See also Rockford Drop Forge Co. v. Donovan*, 672 F.2d 626, 629 (7th Cir. 1982) (action to quash inspection warrant not moot where warrant was partially executed, because further inspection was desired).

DSMDB-2475905v02

Even more closely analogous to the issue here is a decision of the Second Circuit in a case where the plaintiff prisoner had been transferred to another facility, but something of his was retained by the transferring facility. *Thompson v. Carter*, 284 F.3d 411 (2d Cir. 2002). The prisoner, Thompson, brought an action seeking, *inter alia*, an order that one of the corrections officers at the original prison return medication that had been seized from him. The defendants claimed that the case was moot because Thompson had requested only injunctive relief and because he was no longer confined at the original prison where the defendants were employed. But the court held that the action was not moot, stating that, "[i]n this case, a live controversy continues between Thompson and Carter: Thompson's request for an order directing Carter to return Thompson's medications." *Id.* at 415. This was not, the court said, "the more usual [scenario] in which the inmate plaintiff seeks prospective relief . . . against employees at one facility that would be useless after his transfer to a second facility." *Id.* Rather, Thompson retained a legally cognizable interest in the injunctive relief sought.

And finally, the D.C. Circuit found a continuing controversy that avoided mootness in a case where the FBI would retain possession of certain evidence demanded by plaintiffs. In *Utz v. Cullinane*, 520 F.2d 467 (D.C. Cir. 1975), several plaintiffs who had been arrested for and charged with various crimes brought an action for injunctive and declaratory relief to enjoin the D.C. Chief of Police and the director of the police department's records division from transmitting plaintiffs' arrest records (including fingerprint cards) to the FBI, and seeking the return of the records already sent. One of the arguments asserted on appeal by defendant-appellees was that the case was moot, because the plaintiff-appellants' criminal cases had been disposed of and they therefore could not be prejudiced by pre-conviction dissemination of arrest records. But the Court found that substantial rights of the appellants remained to be vindicated,

DSMDB-2475905v02

because the FBI would retain the records already in their possession unless relief was granted, explaining:

> Appellants' constitutional and statutory claims are essentially grounded in the contention that routine dissemination whether preconviction or post-exoneration is improper and results in a *legally cognizable harm; in the absence of an adjudication by this court, the arrest record of appellant Bolling will remain with the FBI*, and those of appellants Utz and Boyd will be transmitted to the FBI, while an adjudication in their favor will eventuate in an order to retrieve those already sent and to refrain from sending those still in the sole possession of the Metropolitan Police. *Clearly, we are presented with a continuing live legal controversy affecting . . . substantial rights.*

*Id.* at 472-73 n.9 (emphasis added). *See also FTC v. Ernstthal*, 607 F.2d 488, 489 (D.C. Cir. 1979) (in appeal from enforcement of subpoenas in FTC proceeding, where FTC retained possession of subpoenaed documents and did not intend to return them if consent decree was reached, Judge Bazelon held that the case was not mooted by the impending disposition of the proceeding, stating "[t]here thus remains a live controversy between the parties").

Common to all of these cases is that the challenged conduct resulted in continuing harm, and the courts still could act to remedy that harm by limiting it prospectively, just as is the situation before the Court on this petition. In these circumstances, the parties retain a legally cognizable interest in the outcome of the matter, despite perhaps some piece of it being "said and done." Counsel for petitioner recognize the novelty of the position that respondent's *partial* production of petitioner's body following his death in custody is not sufficient to avoid mootness, but the case law cited above supports this position. Moreover, the unique circumstances of this case – the suspicious death of petitioner, the lack of any meaningful information or evidence from respondents, and the secretive and highly controversial nature of Guantánamo in general – warrant injunctive relief in the interests of justice.

DSMDB-2475905v02

## III.    Substantial Public Interest Militates In Favor Of The Court Deciding This Case

In addition to the continuing interests at stake in this petition described above that should avoid mootness, courts have recognized an exception to mootness in cases where issues of significant public importance are involved.  "[I]t is settled doctrine that courts go further both to give and withhold relief in the light of consideration of public interest."  *Alton & So. Ry. v. Int'l Ass'n of Machinists*, 463 F.2d 872, 880 (D.C. Cir. 1972), *citing Virginian Ry. Co. v. Sys. Federation No. 40*, 300 U.S. 515, 552 (1937).  For example, the Ninth Circuit has extolled the "public interest in having the issue now before the court resolved with some hope of finality" in a case that the court said "affects the most sensitive of human relationships" (there, the relation between a father and his children; here, the interest of petitioner's father in laying his son – all of him – to rest) and "also directly involves the vital jurisdictional harmony of two sovereign entities" (there, the State of Montana and the Blackfeet Tribe; here, potentially the U.S. and Yemen).  *U.S. ex rel. Cobell v. Cobell*, 503 F.2d 790, 794 (9th Cir. 1974) (appeal of issuance of writ in habeas proceeding brought by father to secure release of children from grandmother's custody was not moot where there had been voluntary cessation of the challenged conduct).  And the Supreme Court of California ruled, in a habeas proceeding, that "issues of grave public concern" would be decided.  *In re M.*, 473 P.2d 737, 741 (Cal. 1970) (holding, despite that petitioner was released from detention and effectively was granted the habeas relief sought, that juvenile courts may not automatically order pre-hearing detention).  The court doubted that it would have another opportunity to resolve the important issues raised and therefore declined to declare the case moot on its unusual facts.  *Id.* at 743.

Although the recognized "desirability of judicial determinations of important questions," standing alone, will not avoid dismissal of an otherwise moot case, *e.g.*, *Alton & So. Ry.*, 463 F.2d at 880, here, petitioner's habeas case is not moot for the reasons discussed in the

13

section above. And while some decisions require a showing of the potential for recurrence of the challenged conduct, the D.C. Circuit has observed that, the greater the level of public interest, the lesser the need for the possibility of recurrence to justify decision. *Id.*; *cf. Richardson v. Ramirez*, 418 U.S. 24, 35-36 (1974) (noting the strong practical argument that conduct "*incapable* of repetition" should be redressed in the public interest because evading review (citation omitted, emphasis added)).

The fact that the people of this nation and the world have been and remain intensely interested in the ongoing imprisonment without charge of hundreds of individuals at Guantánamo Bay, combined with the Supreme Court's recent decision in *Boumediene* and its repercussions in this Court, undeniably show that the Court is confronting issues of international notoriety. Moreover, given the significant media attention accorded the first deaths at Guantánamo in 2006, of which petitioner was one; the subsequent lack of information from the government concerning the investigation (and indeed the government's brazen efforts in this action to review and indefinitely preclude disclosure of *all evidence* concerning the deceased detainees, including everything in their cells, even privileged attorney-client communications)[17]; and the release of the independent autopsy findings concerning petitioner and public call for answers from the U.S. government,[18] there can be no doubt that this *particular action* is of substantial public importance.

---

[17] *See* Resp'ts' Mot. For Procedures Related to Review of Certain Detainee Materials and Request For Expedited Briefing, *Al Salami, et al. v. Bush, et al.*, No. 1:05-cv-02452-PLF, Doc. # 21 (July 7, 2006).

[18] *See, e.g.*, Letter from Santiago A. Canton, Executive Director, Inter-American Commission on Human Rights, Organization of American States, to Michael Ratner and Maria Lahood, Center for Constitutional Rights (June 12, 2006) (attached hereto as Ex. 7) (describing request that the government provide information about the alleged suicides within 10 days), Adam Beaumont, *Doubt Cast Over Guantanamo "Suicides,"* swissinfo (Mar. 2, 2007), available at

DSMDB-2475905v02

Were the Court to grant injunctive relief in this action requiring respondents to produce the remainder of petitioner's body and release the evidence and records associated with the investigation of his death, it is entirely possible that the evidence could demonstrate that petitioner died of homicide, not suicide, and could even implicate his killer or killers. The very real potential of a government cover-up of this magnitude with regard to Guantánamo strongly counsels that the Court decide this case in the interests of justice, transparency, and public understanding.

## CONCLUSION

For cause shown above, counsel for petitioner respectfully submit that the Court should decline to find the instant habeas petition to have been mooted by the untimely death of petitioner in respondents' custody. Petitioner's body has not been fully returned and thus cannot be fully laid to rest. Moreover, it would be a fundamental miscarriage of justice to permit the evidence concerning petitioner's death to be buried with the same callous disregard that respondents exhibited toward petitioner's rights during the last years of his life.

Dated: July 25, 2008

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

/s/ Lisa M. Kaas
David L. Engelhardt (DC429886)
John C. Snodgrass (DC473864)
Lisa M. Kaas (DC492302)
Erin C. Wilcox (DC982059)
DICKSTEIN SHAPIRO LLP
1825 Eye Street, NW
Washington, DC  20006-5403
Tel. (202) 420-2200
Fax (202) 420-2201

http://www.swissinfo.org/eng/swissinfo.html?siteSect=43&sid=7581369 (last visited July 25, 2008) (attached hereto as Ex. 4).

15

DSMDB-2475905v02

*Counsel for Petitioner Salah Ali Abdullah
Ahmed Al Salami, ISN 693*

DSMDB-2475905v02

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2008, a true and correct copy of the

foregoing *Response To Order To Show Cause* was filed by hand-delivery with the Court Security

Officer for clearance for public filing, who served copies upon the following:

**James J. Schwartz**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20001

**Judry Laeb Subar**
U.S. DEPARTMENT OF JUSTICE
P.O. Box 833
Suite 7342
Washington, DC 20044-0833

**Terry Marcus Henry**
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
P.O. Box 883
20 Massachusetts Avenue, NW
Suite 7144
Washington, DC 20044

**Andrew I. Warden**
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
FEDERAL PROGRAMS BRANCH
20 Massachusetts Avenue, NW
Washington, DC 20530

_____/s/ John C. Snodgrass_____
John C. Snodgrass

17

DSMDB-2475905v02

UNCLASSIFIED//~~FOUO~~

## Summary of Administrative Review Board Proceedings for ISN 693

*The Administrative Review Board was called to order.*

*The Designated Military Officer (DMO) was sworn.*

*The Board Reporter was sworn.*

*The Presiding Officer announced the convening authority and purpose of the Administrative Review Board proceedings.*

*The Administrative Review Board members were sworn.*

*The Assisting Military Officer was sworn.*

*The Assisting Military Officer presented the Enemy Combatant Notification form, Exhibit EC-A, to the Administrative Review Board.*

*The Assisting Military Officer presented the Enemy Combatant Election Form, Exhibit EC-B, to the Administrative Review Board.*

*It was noted by the Presiding Officer that from Exhibit EC-B, the Detainee had chosen not to be present for the Administrative Review Board proceedings.*

*The Presiding Officer confirmed that the Assisting Military Officer had met with the Detainee and informed him of his rights regarding the proceedings, that the Detainee appeared to understand the process, that the Unclassified Summary of Evidence was read to the Detainee, that a translator was used during the interview, and that the Assisting Military Officer confirmed that the translator spoke the same language as the Detainee.*

*The Designated Military Officer presented the Unclassified Summary of Evidence, Exhibit DMO-1, and DMO-2, the FBI Redaction Memorandum to the Administrative Review Board.*

*The Designated Military Officer stated that a copy of these exhibits had been previously distributed to the Assisting Military Officer and Detainee.*

*The Designated Military Officer gave a brief description of the contents of the Unclassified Summary of Evidence, Exhibit DMO-1, to the Administrative Review Board.*

*The Presiding Officer asked the Designated Military Officer for any further unclassified information.*

ISN 693
Enclosure (5)
Page 1 of 2

UNCLASSIFIED//~~FOUO~~

# UNCLASSIFIED//FOUO

*The Designated Military Officer confirmed that he had no further unclassified information and requested a closed session to present classified information relevant to the disposition of the Detainee.*

*The Presiding Officer acknowledged the request.*

*When asked if the Assisting Military Officer had any information to present on behalf of the Detainee to the Administrative Review Board, the Assisting Military Officer stated that he previously submitted a summary of the interview.*

*The Presiding Officer read the remainder of the unclassified portion of the Administrative Review Board proceedings, and then adjourned the proceedings.*

*The Presiding Officer opened the classified portion of the session.*

*The Presiding Officer adjourned the classified portion of the session and the Administrative Review Board was closed for deliberation and voting.*

## AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the Administrative Review Board proceedings.



Captain, USN
Presiding Officer

ISN 693
Enclosure (5)
Page 2 of 2


UNCLASSIFIED//FOUO

**Snodgrass, John**

---

| | |
|---|---|
| **From:** | Andrew.Warden@usdoj.gov |
| **Sent:** | Tuesday, May 16, 2006 5:07 PM |
| **Subject:** | RE: JCS letter to Warden 051206 |

**Attachments:** Habeas Counsel Visit Coordination Sheet.doc



Habeas Counsel
Visit Coordinat...

Mr. Snodgrass,

Regarding your visit request, please fill out the attached visit request form, including a list of all visitors (including lawyers and translators), proposed flight information, and a proposed visit schedule. Given the limited flight schedules, you may want to confer with the airlines (Air Sunshine or Lynx Air) on flight availability before submitting your request. Once I have all the required information on the form, I'll forward your request on to Guantanamo personnel and then let you know whether they can accommodate your requested dates.

With respect to the documentation you submitted, as required by the protective order, you have satisfied the requirements for privileged access to petitioner Al Salami.

With respect to petitioner Al Asoryia, we understand that you dispute our conclusion that the detainee you identify as petitioner Al Asoryia has filed a duplicate habeas petition in Alsaaei v. Bush (05-2369-RWR) (ISN 340). If you continue to stand by this position, please send us additional information that would help us match a different ISN number (i.e., other than ISN 340) to the detainee you identify as petitioner Al Asoryia. Without such information, we are unable provide access to an unidentified detainee.

Best regards,

Andrew

Andrew I. Warden
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 6120
Washington, DC 20530
Tel: 202.616.5084
Fax: 202.616.8460

-----Original Message-----
From: SnodgrassJ@dsmo.com [mailto:SnodgrassJ@dsmo.com]
Sent: Friday, May 12, 2006 6:05 PM
To: Warden, Andrew (CIV)
Cc: Henry, Terry (CIV); Campbell, Jennifer
Subject: JCS letter to Warden 051206

Counsel:

Please see attached.


<<JCS letter to Warden 051206.pdf>>

John C. Snodgrass
Dickstein Shapiro LLP
2101 L Street NW, Washington DC 20037
voice +1 (202) 828-2233  fax +1 (202) 887-0689

--------------------------------------------------------
This e-mail message and any attached files are confidential and are intended solely for
the use of the addressee(s) named above. This communication may contain material protected
by attorney-client, work product, or other privileges. If you are not the intended
recipient or person responsible for delivering this confidential communication to the
intended recipient, you have received this communication in error, and any review, use,
dissemination, forwarding, printing, copying, or other distribution of this e-mail message
and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to
monitor any communication that is created, received, or sent on its network.  If you have
received this confidential communication in error, please notify the sender immediately by
reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dsmo.com

Dickstein Shapiro Morin & Oshinsky LLP
http://www.DicksteinShapiro.com
=============================================================================



Alkarama for Human Rights الكرامة لحقوق الإنسان

ولقد كرمنا بني آدم

Dr. Craig T. Mallak
Armed Forces Medical Examiner
1413 Research Boulevard Building
102 Rockville, MD 20850
USA

Geneva, 29 June 2006

**Autopsy of Ahmed Ali Abdullah**

Dear Dr. Mallak,

The family of Ahmed Ali Abdullah requested our organization to help them organize an autopsy of the body of their son who died on 10 June 2006 in the Guantanamo Bay detention camp. We gave a mandate to a medical team directed by Prof. Patrice Mangin, head of the Institute of Legal Medicine of Lausanne University, in Switzerland, to perform this task and the autopsy took place last week in Sanaa.

We would like to put you in touch with the Lausanne medical team which needs some documents, materials and explanations from your side in order for them to finalize their report of autopsy. They need in particular the following:

1) A copy of the report of autopsy carried out by your team and the histological samples as well as the anatomical sample corresponding to the upper airways including the larynx, the hyoid bone and the thyroid cartilage removed in one piece during the autopsy.

2) A copy of the report of the investigation performed by the authorities of the Guantanamo Bay detention camp. More information is required about :

   a) The circumstances of the discovery of Ahmed Ali Abdullah in a state of hanging in his cell.

   b) The modus operandi and the exact nature (documented by photos if possible) of the ligatures used to this effect (the press talked about clothes and bed sheets).

   c) If reanimation measures were taken or not. If yes, what is the nature of these measures (administration or not of drugs, endotracheal intubation) ?

   d) The previous state of the victim, in particular the possible existence of signs of depression, attempt of suicide, hunger strike, and if possible a close photography of the face of Ahmed Ali Abdullah showing his dentition.

   e) The exact conditions of conservation undertaken for the repatriation of the body of Ahmed Ali Abdullah.

   f) The justifications for cutting off the extremities of all the nails of the fingers and toes of the victim.

   g) Any information about suicide attempts during the preceding days or months.

3) A confirmation that the soft internal organs put in a plastic bag inside the body of Ahmed Ali Abdullah belong to him.

We hope that you will be able to contact your colleagues in Lausanne (contact information is given below) and that your exchange will contribute to elucidating the exact circumstances of the death of Ahmed Ali Abdullah.

We thank you in advance for your assistance.

Yours sincerely,

Maitre Rachid Mesli
Legal Director

Copy to Prof. P. Mangin, IUML

Contact Information

Prof. Patrice Mangin
Institut universitaire de Médecine légale (IUML)
Rue du Bugnon 21
1005 Lausanne
Switzerland
Phone :   +41 21 314 70 63
Fax :     +41 21 314 70 90
Email :   patrice.mangin@chuv.ch

# swissinfo.ch

March 2, 2007 - 7:19 PM

## Doubt cast over Guantanamo "suicides"



Professor Mangin said the US authorities hadn't played ball (Keystone)

**Swiss forensic pathologists who carried out an autopsy on a Guantanamo inmate say many questions surrounding his death remain unanswered.**

The team from Lausanne University said all the available evidence pointed to suicide but they could not be 100 per cent sure because the prison authorities had withheld information and material.

"What I find both disappointing and regrettable is that even though there is a priori no reason to doubt suicide, they have not let us have access to evidence that substantiates this theory," said forensic pathologist Patrice Mangin.

According to the United States authorities, Yemeni Ahmed Ali Abdullah, who was in his thirties, was found hanged in his cell at Guantanamo Bay on June 10, 2006. Two Saudi inmates reportedly hanged themselves the same night.

The US government sparked a furore at the time of the "suicides" when senior officials described their deaths as an act of war.

Abdullah's family rejected the initial autopsy carried out at the naval base, saying he would never have taken his own life.

They contacted Geneva-based non-governmental organisation Alkarama for Human Rights which asked Lausanne University's Institute of Legal Medicine to carry out a second autopsy.

This was performed at a military hospital in Sanaa, the capital of Yemen, on June 21 by a team led by professor Mangin.

**Cause of death**

Their report, presented in Geneva on Friday, made it clear that suicide was the most likely cause of death. But Mangin said other hypotheses could not be ruled out as body parts were missing and vital pieces of information had not been handed over.

A request was sent to the US army medical authorities asking for a copy of the original autopsy, histological and anatomical samples, and further explanation surrounding Abdullah's death. But these were not forthcoming.

Pieces of his upper airways including the larynx, hyoid bone and thyroid cartilage – key elements in an autopsy on a hanging victim – were all missing.

Pathologists still don't know how the body was found, the precise nature of the ligature around Abdullah's neck and what measures were taken to revive him (there was a puncture mark on the body).

A Saudi forensic pathologist who carried out a second autopsy on the two Saudi inmates is said to have encountered similar problems with the US authorities.

**Prisoner resistance**

The Yemeni spent four years at Guantanamo where, according to human rights campaigners, he was one of the ringleaders of prisoner resistance, along with the two dead Saudis.

Rachid Mesli, Alkarama's legal director, said a number of witnesses had dismissed the suicide theory.

He added that a "collective suicide" was unlikely due to a number of reasons – not least because the prisoners were under intense surveillance and that it was practically impossible to attach a cord in one of the cells.

"All these outstanding questions lead us to reject the suicide theory," he said.

Dan Wendell, spokesman for the US embassy in Bern, insisted that Washington took its responsibilities at Guantanamo very seriously.

"We do everything possible to protect the inmates even from their own attempts to harm themselves," he told swissinfo.

He added that the bodies of the dead men had been treated humanely and with cultural sensitivity.

swissinfo, Adam Beaumont in Geneva

CONTEXT

Alkarama plans to hand over the dossier to the UN special rapporteur on extrajudicial executions and to the UN special rapporteur on human rights and counter-terrorism.

Abdullah's family also intends to launch legal action in the US in an attempt to get more information released.

KEY FACTS

The US has been holding people whom it suspects of involvement in terrorism at a detention centre in Guantanamo Bay since 2002.
Up to 400 detainees from more than 30 countries are said to be held there.
The Swiss government and the ICRC have raised concerns about human rights at the camp.

LINKS

- Lausanne University's Institute of Legal Medicine (French) (http://www.iuml.ch/)
- Alkarama for Human Rights (http://www.alkarama.org/)
- US embassy in Bern (http://bern.usembassy.gov/)

**URL of this story:**http://www.swissinfo.ch/eng/swissinfo.html?siteSect=105&sid=7581369

Directeur : Professeur Patrice Mangin
Rue du Bugnon 21, CH - 1005 Lausanne
Tél: 41 21 314 70 70 - Fax: 41 21 314 70 90
E-mail: IUML.Central@hospvd.ch

Maître Rachid Mesli
Alkarama for Human Rights
2 bis Chemin des Vignes
1209  Genève

Lausanne, le 20 juillet 2006

*N/réf. M0600113*
*PM/BH/BS/dc*

**Concerne :**     **ALI  ABDULLAH  Ahmed,  né  le  09.03.1969 – 2ème autopsie médico-légale**

Maître,

Par lettre du 19 juin 2006, vous nous avez mandatés, sur demande de la famille, afin de procéder à une seconde autopsie médico-légale du corps d'une personne dont l'identité nous a été communiquée comme étant celle de ALI ABDULLLAH Ahmed, âgé de 37 ans.

Nous avons répondu à votre demande. Nous vous prions de trouver ci-joint notre rapport qui se base sur :

a)     l'autopsie médico-légale (2ème autopsie) effectuée par l'équipe de l'Institut universitaire de médecine légale de Lausanne - Suisse

b)     les examens histologiques

c)     les analyses toxicologiques

d)     les analyses de génétique forensique

e)     l'examen d'odontostomatologie médico-légal

f)     les renseignements communiqués par l'Organisation « Alkarama For Human Rights »

Etat de Vaud - Hospices cantonaux - CHUV
Département universitaire de Médecine et de Santé communautaires
Université de Lausanne - Faculté de Médecine

# Procès-verbal de la 2<sup>ème</sup> autopsie médico-légale

Procès-verbal de l'autopsie médico-légale du corps dont l'identité nous a été communiquée comme étant celle de

**ALI ABDULLAH Ahmed**, né le 09.03.1969 et dont le décès aurait été constaté le 10.06.2006, au camp de détention de Guantanamo Bay,

pratiquée le 21 juin 2006, dès 16h30, à la morgue de l'Hôpital militaire de Sanaa (Yémen), par le Professeur P. MANGIN, Directeur de l'Institut universitaire de médecine légale de Lausanne, le Dr B. HORISBERGER, la Dresse B. SCHRAG, avec l'aide de Monsieur Guido TESTORI, préparateur, et en présence du Procureur adjoint de Sanaa, et des Drs ALKAHIN Fouad, ALHARANI Muktar et ALARIGI Abdul-Rab.

---

## A.  Examen externe

1.  Cadavre d'un homme qui serait âgé de 37 ans, de constitution robuste, présentant un bon état de nutrition et mesurant 164 cm. Il s'agit d'un homme de corpulence moyenne. Le cadavre nous est présenté nu, enveloppé dans un drap blanc en coton et une housse noire en plastique fermant par une fermeture-éclair. Le cadavre apparaît bien conservé, sans signes de putréfaction. Il a été apparemment conservé au froid par congélation. Le jour prévu pour l'autopsie, le cadavre était encore froid, partiellement congelé, si bien que les opérations ont dû être différées de cinq heures, temps nécessaire pour que l'autopsie devienne praticable.

2.  La rigidité cadavérique est abolie au niveau des quatre membres ainsi qu'au niveau des articulations temporo-mandibulaires.

3.  Les téguments sont hâlés, de trophicité et d'hydratation normales. Il n'existe pas de pigmentation particulière. Sur les parties déclives correspondant à un décubitus dorsal, on note des lividités cadavériques de couleur rouge foncé, persistant à la pression d'un doigt. Ces lividités sont également légèrement visibles à la face antérieure des deux jambes. Les parties sur lesquelles le corps repose sont épargnées.

4.  Le cadavre présente des traces d'intervention postmortem sous forme d'incisions linéaires, suturées et compatibles avec une autopsie médico-légale de première intention.  Il s'agit notamment de :

    -   à la face antérieure du tronc, une grande incision en forme de « Y » dont la branche verticale mesure 41 cm et s'étend le long de la ligne médiane de la

région sus-pubienne jusqu'à une ligne horizontale passant à 3 cm au dessus de la ligne bi-mamelonnaire ; à ce niveau, cette incision se poursuit par les deux branches obliques du « Y » de manière symétrique en direction du relief antérieur des deux épaules pour se poursuivre ensuite le long du bord antéro-externe du membre supérieur droit sur une longueur de 60 cm où elle s'interrompt en regard de la face dorsale du poignet et le long du bord antéro-externe du membre supérieur gauche sur une longueur de 60 cm pour se terminer à la face dorsale du poignet correspondant,

- à noter, au niveau de la branche verticale médiane abdominale, que l'incision comporte une autre branche perpendiculaire à la précédente, à 6,5 cm au dessus de l'ombilic, dirigée sur 4 cm vers la droite,

- au niveau du membre supérieur droit, présence d'une autre incision postmortem s'étendant le long du bord postéro-interne, débutant de la région postérieure de l'épaule correspondante jusqu'à la face antérieure du poignet droit, sur une longueur de 70 cm,

- au niveau du membre supérieur gauche, la même incision postmortem que la précédente se retrouve le long du bord postéro-interne, sur une longueur de 70 cm et s'étendant de la région postérieure de l'épaule correspondante jusqu'à la face antérieure du poignet gauche,

- au niveau du tiers inférieur de l'avant-bras droit, présence de sept incisions postmortem suturées, linéaires, verticales, parallèles, réparties sur l'ensemble de la circonférence et mesurant jusqu'à 7,5 cm de long,

- au niveau du tiers inférieur de l'avant-bras gauche, le même type d'incision postmortem est retrouvé au nombre de six et mesurant jusqu'à 8 cm de long,

- au niveau des membres inférieurs, présence à gauche d'une grande incision postmortem verticale, linéaire, s'étendant de la région inguinale, le long de la face antérieure de la cuisse, du genou, de la jambe et s'arrêtant à hauteur de la cheville après une distance de 80 cm,

- au niveau du membre inférieur droit, même type d'incision que la précédente s'étendant de la région inguinale jusqu'à la cheville, le long de la face antérieure de la cuisse, du genou et de la jambe, sur une hauteur de 85 cm,

- à la face postérieure du tronc et des membres inférieurs, présence de deux grandes incisions postmortem verticales, linéaires, parallèles, para-médianes gauche et droite, s'étendant symétriquement des régions scapulaires postérieures droite et gauche jusqu'aux régions fessières homolatérales, puis le long des faces postérieures des cuisses, des régions poplitées, des faces postérieures des deux jambes pour s'interrompre des deux côtés au dessus

des talons ; l'incision para-médiane droite mesure 141 cm ; l'incision para-médiane gauche mesure 139 cm,

- au niveau du membre inférieur droit, en regard du tiers inférieur de la jambe, présence de sept incisions postmortem verticales, linéaires, suturées, parallèles, réparties sur l'ensemble de la circonférence du membre et mesurant jusqu'à 16 cm de long,

- au niveau du membre inférieur gauche, en regard du tiers inférieur de la jambe, présence de six incisions postmortem verticales, linéaires, suturées, parallèles, s'échelonnant sur l'ensemble de la circonférence et mesurant jusqu'à 13 cm de long,

- au niveau de l'extrémité céphalique, présence d'une incision postmortem en forme de « fer à cheval » s'étendant d'une région mastoïdienne à l'autre en passant à hauteur des jonctions pariéto-occipitales et mesurant 36 cm de long; à noter également une autre incision postmortem suturée s'étendant dans la région sous-occipitale droite, le long de la base du crâne sur une longueur de 5 cm et siégeant au sein d'une plaque parcheminée mesurant 5,5 x 3 cm,

- au niveau de la moitié inférieure de la partie postérieure du cou, présence d'une incision postmortem verticale, le long de la ligne médiane, s'étendant jusqu'à la région thoracique supérieure sur une longueur de 21 cm ; cette incision se termine de façon légèrement curviligne vers la droite à sa partie inférieure.

5.  La tête est de forme ovale avec une mobilité anormale de la calotte crânienne en rapport avec une autopsie déjà effectuée ainsi qu'attestent les multiples incisions postmortem déjà décrites. Les cheveux sont de couleur noire, d'une longueur moyenne de 3 cm. Pour rappel, le cuir chevelu est l'objet d'une incision en « fer à cheval » allant d'une mastoïde à l'autre. En dessous et en arrière de cette incision, le cuir chevelu a été rasé sur une hauteur de 3 cm ainsi qu'au niveau de la région occipitale médiane basse sur une surface de 10 x 4 cm. On note par ailleurs la présence de deux plaques parcheminées, de constitution postmortem, mesurant pour l'une 1,5 x 1 cm et l'autre 5 x 2 cm. Ces deux plaques parcheminées siègent dans la région occipitale médiane pour la plus grande et dans la région rétro-mastoïdienne gauche pour la plus petite. Au niveau de la région rétro-mastoïdienne droite, il existe trois autres plaques parcheminées mesurant respectivement 0,7 cm de diamètre, 1 x 0,7 cm et 1 x 1,7 cm. Pour rappel, présence d'une incision postmortem le long de la base du crâne dans la région sous-occipitale droite mesurant 5 cm et siégeant au sein d'une plaque parcheminée mesurant 5,5 x 3 cm.

6.  Les téguments de la face sont pâles, sans signes de congestion visibles. On note la présence d'une barbe avec des poils noirs mesurant de 2 à 3 cm de long.

7. Le squelette facial est intact.

8. Les yeux sont fermés. Les globes oculaires sont affaissés. Les conjonctives sont le siège d'une hyperémie, sans pétéchies caractéristiques visibles. Les sclérotiques sont sans particularité Les cornées sont troubles. Les pupilles ne sont plus visibles. L'iris est de couleur difficilement appréciable. Présence d'une zone parcheminée de 0,5 cm de diamètre en dessous de l'angle externe de l'œil gauche, en regard du rebord orbitaire externe.

9. Le squelette nasal est intact. Les orifices narinaires sont obstrués par deux tampons d'ouate imbibés par un liquide rouge brunâtre.

10. Les lèvres sont l'objet d'une déshydratation avec un dessèchement plus marqué au niveau de la lèvre inférieure. Au niveau de l'arcade dentaire inférieure, on note l'absence de la première incisive médiane gauche (N° 31). En regard, la gencive est l'objet d'une plaie contuse à bords irréguliers de 0,7 cm de haut et 0,3 cm de large. Cette plaie est entourée d'une zone de suffusion hémorragique s'étendant sur une largeur de 2,5 cm au niveau du sillon gingivo-labial (exarticulation de la dent N° 31). Le reste de la dentition présente un état satisfaisant. A noter la présence d'un liquide brunâtre au fond de l'orifice buccal.

11. Les pavillons auriculaires sont sans particularité Les conduits auditifs externes sont libres.

12. Le cou est le siège d'un sillon de couleur rouge brunâtre, incomplet au niveau de la région occipitale médiane. Ce sillon est orienté obliquement de bas en haut et d'avant en arrière. Dans sa partie antérieure, il se situe en regard du tiers moyen de la face antérieure du cou. Au niveau postérieur, le point de suspension virtuel se situe dans la région occipitale médiane. Ce sillon est bien visible dans les régions latérales du cou où il est parcheminé et s'estompe en arrière à la verticale de l'insertion postérieure de l'oreille droite et à gauche à la verticale du massif mastoïdien correspondant où il semble se prolonger par quelques plaques parcheminées de 0,5 cm de diamètre. Dans son trajet latéro-cervical droit et gauche, ce sillon est bien délimité et mesure 1 cm de hauteur. En revanche, dans sa partie antérieure, il est moins bien délimité sur quelques centimètres et moins visible à la face antérieure du cou où il s'étend sur une hauteur de 2 cm au maximum. Le cou ne présente aucune mobilité anormale, en particulier pas d'effet de piston.

13. La cage thoracique est normalement bombée. La palpation du gril costal révèle des fausses mobilités en rapport avec les manœuvres d'autopsie antérieure.

14. L'abdomen est plat. Au niveau de la fosse iliaque droite, présence d'une plaque parcheminée filiforme, horizontale, de 0,5 x 0,1 cm.

15. La région pubienne a été rasée. Les organes génitaux externes sont normalement développés. Présence d'une circoncision ancienne. Les testicules ne sont pas palpables au niveau des bourses.

16. Les téguments du dos sont sans particularité A noter une fine cicatrice verticale, légèrement oblique, au niveau de la ligne axillaire postérieure droite, mesurant 3 x 0,2 cm, située à 17 cm en dessous du creux axillaire pour sa partie supérieure.

17. Le membre supérieur droit est en position normale. On note la présence d'une zone de dermabrasion de 0,8 x 0,4 cm sur le versant interne de l'articulation du coude. Cette dermabrasion est de couleur rouge foncé et légèrement parcheminée. Au niveau du pli du coude droit, au sein d'une grande ecchymose rouge violacé, de 8 cm de haut sur 4,5 cm de large, il existe une plaie punctiforme de 0,2 cm de diamètre. Au niveau de la face dorsale de la main droite, dans sa partie supéro-interne, il existe une ecchymose mal délimitée, de couleur rouge foncé, mesurant 6 cm de haut sur 3 cm de large. A noter qu'à la loupe binoculaire, le centre de cette ecchymose présente une petite plaie orificielle de moins de 1 mm de diamètre. Au niveau de la main droite, les extrémités des ongles ont été découpées. Les bords des ongles sont ainsi irréguliers, en partie amputés, avec de petites excoriations du lit de chaque ongle en regard. La région palmaire est le siège d'une pigmentation noirâtre (prélèvement des empreintes digitales).

18. Le membre supérieur gauche est en position normale. On note la présence d'une dermabrasion linéaire, filiforme, légèrement oblique, mesurant 4 cm de long sur 0,2 cm de large. Autre dermabrasion filiforme, parallèle à la précédente, à 2 cm au dessus, mesurant 0,3 cm de long. Les bords des ongles de la main gauche ont été également découpés. Les bords sont irréguliers, en partie amputés, avec aussi des petites excoriations du lit de chacun des ongles en regard. Au niveau des deux mains, on note une cyanose unguéale prononcée. La région palmaire est le siège d'une pigmentation noirâtre (prélèvement des empreintes digitales).

19. Les membres inférieurs sont en position normale. Au niveau de la hanche gauche, sur sa face externe, il existe plusieurs zones de parcheminement rouge brunâtre, sur une surface de 6 cm de haut et 5 cm de large, mesurant chacune jusqu'à 1 cm de long sur 0,2 cm de large. Sur la face antéro-externe de la moitié supérieure de la cuisse gauche, présence d'une zone de discoloration intéressant une surface de 7 cm de haut sur 4 cm de large et marquée par des circonvolutions violacées mesurant jusqu'à 1 cm de long. La face plantaire des deux pieds est également l'objet d'une pigmentation noirâtre (prélèvement des empreintes plantaires). A noter que les extrémités des ongles des orteils ont également été découpées tant à droite qu'à gauche.

# B. Incisions des téguments et des plans sous-jacents

## 20. Nuque

L'ouverture de la nuque est pratiquée à travers l'incision déjà présente sur la ligne médiane.

*Etat actuel :*

- altération cadavérique modérée de la musculature

*Interventions complémentaires :*

- prolongation de l'incision sur la ligne médiane de 2 à 3 cm dans la région basse occipitale
- incisions longitudinales de la musculature
- palpation des processus épineux de la colonne cervicale et de la partie supérieure de la colonne thoracique

*Constatations :*

- pas d'ecchymose, ni hématome
- pas de fausse mobilité des processus épineux lors de la palpation

## 21. Parties distales des membres

L'ouverture des parties distales des membres est pratiquée à travers les incisions déjà présentes.

## 22. *Tiers distal de l'avant-bras droit*

*Etat actuel :*

- 7 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

23. *Tiers distal de l'avant-bras gauche*

*Etat actuel :*

- 6 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

24. *Tiers distal de la jambe droite*

*Etat actuel :*

- 7 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

25. *Tiers distal de la jambe gauche*

*Etat actuel :*

- 6 incisions longitudinales intéressant la peau et le tissu sous-cutané, ouvrant partiellement les fascia musculaires

*Constatations :*

- pas d'ecchymose ni hématome dans les plans cutané, sous-cutané et musculaire

26. *Pli du coude droit*

*Etat actuel :*

- plaie punctiforme fraîche entourée d'une ecchymose

*Interventions complémentaires :*

- incision intéressant la peau et le tissu sous-cutané
- prélèvement : peau avoisinant la plaie punctiforme

*Constatations :*

- suffusion hémorragique dans le tissu sous-cutané

## 27. *Dos de la main droite*

*Etat actuel :*

- plaie punctiforme entourée d'une ecchymose

*Interventions complémentaires :*

- incision intéressant la peau et le tissu sous-cutané
- prélèvement : peau avoisinant la plaie punctiforme

*Constatations :*

- suffusion hémorragique dans le tissu sous-cutané

# C. Ouverture des cavités et examen du cou

## 28. Cavité crânienne

L'ouverture du crâne est pratiquée à travers l'incision déjà présente.

*Etat actuel :*

- pour rappel : incision du cuir chevelu mesurant environ 36 cm de long en «fer à cheval» à concavité ouverte vers l'arrière, s'étendant d'un processus mastoïdien à l'autre
- ouverture de la calotte crânienne suivant la base du crâne
- la calotte crânienne est fixée au moyen d'un fil de suture avec plusieurs « va et vient » d'un muscle temporal à l'autre
- la dure-mère a été détachée et enlevée
- la cavité crânienne a été totalement éviscérée
- ouverture partielle de la partie médiane de la base de l'étage antérieur au niveau du corps sphénoïdal et de l'éthmoïde

*Interventions complémentaires :*

- incisions des muscles temporaux
- incisions de la galéa aponévrotique

*Constatations :*

- cuir chevelu : rougeâtre, d'épaisseur moyenne
- cuir chevelu et muscles temporaux : pas d'ecchymose ni hématome
- dure mère : absente
- calotte crânienne : 14,8 x 17,5 cm de diamètre, entre 0,3 et 0,9 cm d'épaisseur, pas de fausse mobilité, pas de transparence pathologique
- base du crâne : configuration normale aux trois étages, sans particularité en dehors de l'ouverture de la partie médiane de la base de l'étage antérieur (voir ci-dessus)
- l'hypophyse est inappréciable

## 29. Cavité thoraco- abdominale

L'ouverture de la cavité thoraco- abdominale est pratiquée à travers l'incision déjà présente sur la ligne médiane.

*Etat actuel :*

- section du plastron
- présence d'un sac en plastique orange contenant des viscères
- cavité thoraco-abdominale : vide par éviscération totale une fois le sac en plastique enlevé avec présence de quelques millilitres de liquide rouge brunâtre (sang?) dans les gouttières latéro-vertébrales thoraciques et lombaires

*Interventions complémentaires :*

- ouverture de la colonne vertébrale
- dégagement des côtes et des clavicules
- incisions des muscles psoas
- prélèvements : muscles psoas

*Constatations :*

- pannicule adipeux thoracique et abdominal : peu épais
- musculature des parois thoraco-abdominales : pas d'ecchymose ni hématome
- gril costal : élasticité correspond à l'âge, pas de fracture
- colonne vertébrale : pas de fracture des corps vertébraux
- disques intervertébraux : pas d'hémorragie (absence de signes de Simon)

- bassin : pas de fracture

## 30. **Cou**

L'ouverture du cou est pratiquée par deux incisions sur les faces latérales.

*Etat actuel :*

- éviscération du cou

*Interventions complémentaires :*

- incision à la face latérale droite, s'étendant de l'épaule droite à la région mastoïdienne droite
- incision à la face latérale gauche, s'étendant de l'épaule gauche à la région mastoïdienne gauche
- incisions du platysma jusqu'au niveau de l'arcade dentaire inférieure
- incisions dans la musculature pré- et paravertébrale
- ouverture des artères carotides
- prélèvements : fragment de la peau au niveau du sillon, fragment de tissu fibro-adipeux à gauche, fragment du muscle sterno-cleïdo-mastoïdien droit

*Constatations :*

- circonférence du cou : 39,5 cm
- tissu fibro-adipeux : en regard du sillon déjà décrit, dans la région latéro-cervicale gauche, juste en dessous et légèrement en arrière de l'angle mandibulaire, présence d'une suffusion hémorragique mesurant 2,5 cm de large, 2 cm de haut et 0,3 cm de profondeur
- musculature : en regard du même sillon parcheminé, dans la région latéro-cervicale droite, au niveau de la moitié supérieure du muscle sterno-cleïdo-mastoïdien et dans sa partie antérieure, présence d'une suffusion hémorragique mesurant 3 cm de large, 6,5 cm de haut et 1,5 cm de profondeur
- musculature pré- et paravertébrale : pas d'ecchymose ni d'hématome
- musculature et tissu fibro-adipeux en regard du bord supérieur de la partie médiane de la mandibule et de l'arcade dentaire inférieure : pas d'ecchymose ni hématome
- artères carotides : discrets signes d'artériosclerose, davantage au niveau des bifurcations carotidiennes
- colonne vertébrale : sans particularité à la palpation

## D. Examen des viscères

31. Dans le sac en plastique orange mentionné ci-dessus, les viscères suivants ont été retrouvés.

32. **Cerveau**

   *Etat actuel :*
   - découpé en tranches

   *Interventions complémentaires :*
   - prélèvements : cortex, cervelet

   *Constatations :*
   - cortex, cervelet : en partie identifiable
   - consistance : friable à pâteuse
   - couleur : gris à rosé
   - pas de tumeur solide, pas de hémorragie, pas de corps étranger

33. **Organes du cou**

34. *Langue*

   *Etat actuel :*
   - séparée des viscères du cou
   - siège d'une section transversale

   *Constatations :*
   - relief : normal
   - pas d'ecchymose ni d'hématome

35. *Thyroïde*

   *Etat actuel :*
   - fragments de parenchyme thyroïdien

   *Interventions complémentaires :*
   - prélèvement : fragment de parenchyme

*Constatations :*

- parenchyme : sombre, homogène, sans hémorragie

## 36. *Trachée*

*Etat actuel :*

- présence uniquement du tiers inférieur avec bifurcation identifiable
- ouverte dans la partie membraneuse

*Constatations :*

- pas d'ecchymose, ni d'hématome, ni de corps étranger
- muqueuse : rouge brunâtre, autolysée

## 37. **Organes du thorax**

## 38. *Péricarde*

*Etat actuel :*

- en partie présent
- rouge foncé

*Constatations :*

- pas de lésions

## 39. *Cœur*

*Etat actuel :*

- à l'état de fragments
- partiellement disséqué, pointe séparée

*Interventions complémentaires :*

- ouverture du départ des artères coronaires
- prélèvements : fragments des parois des ventricules

*Constatations :*

- myocarde : élastique, brun rouge, pas de foyer de fibrose ni d'infarctus
- épaisseur du myocarde : 0,3 cm au niveau du ventricule droit, 1,4 cm au niveau du ventricule gauche

- système valvulaire : limité à la valve aortique
- valve aortique : 6 cm de circonférence, souple
- artères coronaires : identifiables qu'à l'origine avec quelques rares plaques d'artériosclérose

## 40. *Poumon (bilobé)*

*Etat actuel :*

- altération cadavérique modérée
- incisions au niveau des régions para- et péri-hilaires

*Interventions complémentaires :*

- ouverture des artères pulmonaires
- ouverture des bronches
- incisions plus fines de l'ensemble du parenchyme
- prélèvement : fragment du parenchyme pulmonaire

*Constatations :*

- pas de pétéchies sous-pleurales
- plèvre : lisse, brillante
- parenchyme : homogène, violacé, succulent
- artères pulmonaires : lumière libre, paroi souple
- bronches : lumière libre, muqueuse rouge foncée

## 41. *Poumon (trilobé)*

*Etat actuel :*

- altération cadavérique modérée
- incisions au niveau des régions para- et péri-hilaires

*Interventions complémentaires :*

- ouverture des artères pulmonaires
- ouverture des bronches
- incisions plus fines de l'ensemble du parenchyme
- prélèvement : fragment du parenchyme pulmonaire

*Constatations :*

- pas de pétéchies sous-pleurales
- plèvre : lisse, brillante
- parenchyme : homogène, violacé, succulent
- artères pulmonaires : lumière libre, paroi souple
- bronches : lumière libre, muqueuse rouge foncée

42. **Organes abdominaux**

43. *Diaphragme*

*Etat actuel :*

- séparé des viscères
- en partie présent sous forme d'un grand fragment détaché

*Constatations :*

- homogène, violacé
- sans particularité

44. *Rate*

*Etat actuel :*

- organe en entier
- découpé en tranches transversales

*Interventions complémentaires :*

- prélèvement : fragment du parenchyme

*Constatations :*

- taille : 5 x 8 x 2,5 cm
- capsule : mince
- surface : lisse
- parenchyme : homogène, rouge foncé, diffluente
- structure : pas reconnaissable

45. *Foie*

*Etat actuel :*

- sous forme de quelques fragments
- entièrement découpés en tranches

*Interventions complémentaires :*

- prélèvements : fragments du parenchyme

*Constatations :*

- capsule : mince
- surface : lisse
- parenchyme : brun rougeâtre, structure habituelle, consistance élastique, friabilité normale
- pas de signes de fibrose ou de stéatose

46. *Reins*

*Etat actuel :*

- deux reins présents
- entièrement découpés en tranches
- bassinets : ouverts

*Interventions complémentaires :*

- prélèvements : parenchyme

*Constatations :*

- surfaces : lisses
- parenchymes : flasques, structure habituelle
- bassinets : souples

47. *Aorte*

*Etat actuel :*

- fragment d'aorte abdominale jusqu'au niveau de la bifurcation iliaque
- ouverte longitudinale
- absence des artères rénales

*Interventions complémentaires :*

- mesure de la circonférence

*Constatations :*

- circonférence au dessus du tronc coeliaque : 4 cm
- circonférence en dessous du tronc coeliaque : 3,5 cm
- paroi : souple
- intima : rougeâtre, quelques rares plaques d'artériosclérose

## 48. *Estomac*

*Etat actuel :*

- présent avec ouverture le long de la grande courbure

*Constatations :*

- paroi : sans particularité
- séreuse : sans particularité
- muqueuse : brun noirâtre, autolysée

## 49. *Intestins*

*Etat actuel :*

- extraits en bloc de la cavité abdominale

*Interventions complémentaires :*

- ouverture des intestins

*Constatations :*

- sans particularité
- appendice : pas identifiable
- signes d'autolyse

## 50. *Vessie*

*Etat actuel :*

- cavité ouverte à la face antérieure

*Interventions complémentaires :*

- évaluation de la perméabilité des méats à la sonde

*Constatations :*

- paroi : structure habituelle
- muqueuse : jaune grisâtre, légèrement autolysée
- trigone : d'aspect normal
- méats : perméables

## 51. Organes absents ou non identifiés

Les organes suivants n'ont pas pu être retrouvés ou identifiés:

- larynx et pharynx
- cartilage thyroïdien
- os hyoïde
- partie supérieure de la trachée
- partie de la musculature du cou
- ganglions cervicaux
- oesophage
- loges rénales
- mésentère
- surrénales
- pancréas
- vésicule biliaire
- prostate
- testicules
- appendice
- hypophyse

## E. Prélèvements

52. En vue d'analyses toxicologiques, nous avons prélevé du liquide rouge brunâtre (sang?) des cavités thoraco-abdominales, du muscle squelettique (muscle ilio-psoas des deux côtés), des fragments de foie, de reins, de cortex cérébral et une touffe de cheveux.

53. En vue d'examens histologiques, nous avons prélevé des fragments de tissus ou d'organes suivants :

- tissu fibro-adipeux sous l'angle mandibulaire gauche   (SM-G)
- muscle sterno-cléïdo-mastoïdien droit   (SC-D)
- artère carotide droite   (C-D)
- artère carotide gauche   (C-G)
- poumon trilobé   (P-D)
- poumon bilobé   (P-G)
- ventricule gauche du coeur   (VG)
- ventricule droit du coeur   (VD)
- foie   (F)
- rate   (R)
- reins (gauche et droit)   (RE)
- cervelet   (CV)
- cortex cérébral   (CO)
- peau du sillon au cou   (SI)
- trace d'injection/ponction au pli du coude droit   (IC)
- trace d'injection/ponction au dos de la main droite   (IM)

54. En vue d'analyses génétiques, nous avons prélevé du muscle squelettique (muscle ilio-psoas) et du liquide rouge brunâtre (sang?) de la cavité thoraco-abdominale.

Dr B. HORISBERGER
Médecin hospitalier

Professeur P. MANGIN

Dresse B. SCHRAG
Médecin assistant

# **Examens histologiques**

### *Cervelet*
### *(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Le prélèvement correspond à une coupe d'un lobe cérébelleux. La structure générale est conservée. On note cependant la présence d'un très discret début d'altération à caractère postmortem. On ne constate pas de lésion notable. La réaction au bleu de Prusse est négative.

### *Cortex cérébral*
### *(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Les prélèvements correspondent aux régions corticale et sous-corticale. La structure générale est conservée. Dans le tissu périvasculaire de plusieurs vaisseaux, on note la présence de dépôts de pigments brun jaunâtre, avec pour la plupart un discret infiltrat inflammatoire de cellules mononucléées. Le reste ne présente pas de lésion notable. La réaction au bleu de Prusse est négative.

### *Ventricule gauche du cœur*
### *(coloration hématoxyline- éosine et van Gieson)*

Le prélèvement correspond à une section de la paroi du ventricule. La structure générale est conservée. On note cependant la présence de quelques discrets amas basophiles, de type bactérien postmortem. Les fibres musculaires sont régulièrement ordonnées, de taille moyenne. On note la présence de modifications à caractère postmortem (fragmentation) ainsi que par endroits de discrètes zones de bandes de contraction (de type I). Le tissu interstitiel est sans particularité L'épicarde et l'endocarde sont sans particularité

### *Ventricule droit du cœur*
### *(coloration hématoxyline-éosine et van Gieson)*

Le prélèvement correspond à une coupe du ventricule. La structure générale est encore conservée, mais présente des débuts d'altération à caractère postmortem. On constate la présence de tissu adipeux sous-épicardique, plus abondant qu'au niveau du ventricule gauche et s'étendant également jusque dans la couche musculaire. Les fibres musculaires présentent par endroits une discrète ondulation.

### Reins
*(coloration hématoxyline-éosine et van Gieson)*

Les prélèvements ont été effectués au niveau des deux reins (un prélèvement par rein). La structure générale est l'objet d'un début d'altération à caractère postmortem, avec diminution, voire perte de la colorabilité des noyaux, en particulier l'épithélium des tubes urinifères et un début d'homogénéisation des structures, limitant l'interprétation. On ne constate cependant pas de lésion notable.

### Foie
*(coloration hématoxyline-éosine et van Gieson)*

Le prélèvement correspond au parenchyme hépatique. La structure générale est l'objet d'un début d'altération postmortem, avec diminution de la colorabilité des noyaux et modifications à caractère postmortem du parenchyme, limitant l'interprétation. On ne note cependant pas de fibrose, ni d'infiltrat inflammatoire. Les hépatocytes présentent une clarification hépatocytaire et, par endroits, une discrète vacuolisation (vacuoles optiquement vides, essentiellement microvésiculaires). Les espaces portes sont sans particularité

### Rate
*(coloration hématoxyline-éosine et van Gieson)*

Le prélèvement correspond au parenchyme splénique. La structure générale est l'objet d'un début d'altération à caractère postmortem. On ne constate cependant pas de lésion notable au niveau des pulpes blanche et rouge.

### Poumon trilobé
*(coloration hématoxyline-éosine, van Gieson)*

Le prélèvement correspond au parenchyme du poumon trilobé. La structure générale est conservée. On note cependant la présence de quelques amas basophiles de type bactérien postmortem. Les septa et les alvéoles sont d'aspect habituel. Dans la lumière des alvéoles, on note la présence de plusieurs pneumocytes desquamés, ainsi que par endroits du matériel éosinophile pâle (œdème). Les capillaires regorgent d'hématies.

### Poumon bilobé
*(coloration hématoxyline-éosine, van Gieson)*

Le prélèvement correspond au parenchyme du poumon bilobé. La structure générale est conservée. On note cependant la présence de quelques amas basophiles de type bactérien postmortem. Les septa et les alvéoles sont d'aspect habituel. Dans la lumière

des alvéoles, on note la présence de plusieurs pneumocytes desquamés, ainsi que, par endroits, du matériel homogène éosinophile pâle (œdème). Les capillaires regorgent d'hématies.

### Peau du sillon au cou
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Le prélèvement a été effectué à cheval sur le sillon et la peau saine avoisinante. Il comporte l'épiderme, le derme et l'hypoderme. La structure générale est conservée. A hauteur du sillon, l'épiderme est mince, avec des noyaux plus denses, plus rapprochés et de forme plus allongée qu'au niveau de la peau saine. On ne constate pas de signe de suffusion hémorragique ni dans le derme ni dans l'hypoderme. La réaction au bleu de Prusse est négative.

### Tissu fibro-adipeux sous l'angle mandibulaire gauche
*(coloration hématoxyline- éosine, van Gieson et bleu de Prusse)*

Le prélèvement comporte du tissu adipeux entrecoupé par des travées de tissu fibreux, du tissu fibreux en plages, de la musculature squelettique ainsi que du parenchyme glandulaire. La structure générale est conservée. On note la présence d'hématies extravasées (suffusions hémorragiques) au sein du tissu fibro-adipeux, sans réaction inflammatoire. Le parenchyme glandulaire est sans particularité Au niveau du muscle squelettique, on note la présence de quelques plages où les myocytes comportent des bandes de contraction (de type I). La réaction au bleu de Prusse est négative.

### Muscle sterno-cléido-mastoïdien droit
*(coloration hématoxyline- éosine, van Gieson et bleu de Prusse)*

Le prélèvement comporte des fibres musculaires, par endroits séparées par du tissu interstitiel fibreux. La structure générale est conservée. On constate la présence, par endroits d'hématies extravasées (suffusions hémorragiques), sans réaction inflammatoire. A certains endroits, les myocytes présentent des bandes de contraction de type I et II. La réaction au bleu de Prusse est négative.

### Artère carotide droite
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Trois prélèvements ont été effectués. La structure générale est conservée On constate la présence d'une paroi vasculaire de type artériel, ne présentant pas de lésion en dehors, par endroits, d'un très discret épaississement intimal (de type athéromateux). On ne constate en particulier pas de suffusion hémorragique. La réaction au bleu de Prusse est négative.

*Artère carotide gauche*
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Trois prélèvements ont été effectués. La structure générale est conservée On constate la présence d'une paroi vasculaire de type artériel, ne présentant pas de lésion en dehors, par endroits, d'un épaississement intimal (de type athéromateux), plus marqué qu'au prélèvement de l'artère carotide droite. On ne constate en particulier pas de suffusion hémorragique. La réaction au bleu de Prusse est négative.

*Trace d'injection/ponction au coude droit*
*(coloration hématoxyline-éosine, van Gieson et bleu de Prusse)*

Le prélèvement correspond à une section transversale intéressant l'épiderme, le derme et l'hypoderme. La structure générale est conservée. Comme seule lésion notable, on note la présence d'hématies extravasées au niveau de l'hypoderme, sans réaction inflammatoire. La réaction au bleu de Prusse est négative.

*Trace d'injection/ponction au dos de la main droite*
*(coloration hématoxyline éosine, van Gieson et bleu de Prusse)*

Le prélèvement correspond à une section transversale intéressant l'épiderme, le derme et l'hypoderme. La structure générale est conservée. Comme seule lésion notable, on note la présence d'hématies extravasées au niveau de l'hypoderme, sans réaction inflammatoire. La réaction au bleu de Prusse est négative.

# Diagnostic anatomo-pathologique

## 1) Signes de violence contre le cou

- Sillon aux deux tiers circulaire, avec une partie antérieure, située au tiers moyen du cou, large et mal délimitée, et des parties latérales plus étroites, parcheminées et mieux délimitées, ascendantes vers l'arrière, s'estompant en arrière avec le point de suspension virtuelle situé au niveau de la région occipitale

- Suffusion hémorragique de la partie supérieure du bord antérieur du muscle sterno-cléido-mastoïdien droit

- Suffusion hémorragique du tissu fibro-adipeux du cou, située juste en dessous de l'angle mandibulaire gauche

## 2) Autres lésions traumatiques vitales

- Traces d'injection/ponction entourées d'une ecchymose, l'une située au pli du coude droit, l'autre au dos de la main droite

- Exarticulation complète de la première incisive inférieure gauche (dent N° 31), avec déchirure de la gencive et suffusion hémorragique en regard

- Ebréchure récente du rebord incisif de la dent N° 22

- Erythèmes sulculaires localisés au niveau des dents N° 12, 11, 21, 22, susceptibles d'évoquer des signes de subluxation dentaire

- Fracture de l'angle mésial de la dent N° 41, susceptible d'être associée à l'exarticulation de la dent N° 31

## 3) Lésions préexistantes

- Très discrets signes d'artériosclérose (bifurcation des artères carotidiennes, aorte abdominale)

- Hémorragies périvasculaires anciennes et discrètes au niveau du cortex cérébral

## 4) Lésions consécutives à des interventions postmortem

- Cadavre ayant fait l'objet d'une autopsie intéressant les trois cavités, avec ouvertures de la face postérieure du tronc, des faces antérieures et postérieures des membres et plusieurs incisions postmortem au niveau des poignets et des chevilles

- Parties d'organes ou organes entiers manquants ou non identifiables: larynx, pharynx, cartilage thyroïdien, os hyoïde, partie supérieure de la trachée, partie de la musculature du cou, ganglions cervicaux, œsophage, loges rénales, mésentère, surrénales, pancréas, vésicule biliaire, prostate, testicules, appendice, hypophyse

## 5) **Autre constatation**

- Début d'altération cadavérique

## Institut universitaire de médecine légale

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : 41 21 / 314 70 70 – Fax : 41 21 / 314 70 90
E-mail : IUML.Central@inst.hospvd.ch

Laboratoire de toxicologie et de chimie forensiques

Lausanne, le 29-06-2006

**Concerne:**  **Dossier ALC 35502, Batch 764**
**Ahmed ALI ABDULLAH, 09.03.1969**

Nous avons effectué un dosage de l'alcool éthylique sur l'échantillon n° M0600113, au nom de
Ahmed ALI ABDULLAH:

Type d'échantillon:  Sang                  Date du prélèvement:   21-06-2006
Date de réception:   26-06-2006            Heure du prélèvement:

Résultats:

**Taux moyen d'alcool: 0.18 grammes pour mille.**
Intervalle de confiance: [0.13 ; 0.23] grammes pour mille.

Remarque:

Dr. Marc Augsburger
Biologiste, Toxicologue
Responsable du laboratoire

Copie:  Prof Patrice Mangin, IUML, Rue du Bugnon 21, 1005 Lausanne

*Le présent rapport ne concerne que les échantillons soumis à l'analyse. Des précisions sur les méthodes d'analyses
utilisées peuvent être obtenues sur demande.*

*Les échantillons seront encore conservés pendant une année après la date de remise du présent rapport. Passé ce
délai, et sauf avis contraire explicite de votre part, l'échantillon sera détruit.*

*Ce rapport ne peut pas être reproduit partiellement. L'utilisation de résultats individuels est autorisée si leur source est
citée.*

Etat de Vaud – Hospices cantonaux
Département Universitaire et de Santé communautaires
Université de Lausanne – Faculté de Médecine



Institut universitaire de médecine légale

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : 41 21 / 314 70 70 – Fax : 41 21 / 314 70 90
E-mail : IUML.Central@inst.hospvd.ch

Laboratoire de toxicologie et de chimie forensiques

Lausanne, le 29-06-2006

**Concerne:**    **Dossier ALC 35503, Batch 764**
**Ahmed ALI ABDULLAH, 09.03.1969**

Nous avons effectué un dosage de l'alcool éthylique sur l'échantillon n° M0600113., au nom de
Ahmed ALI ABDULLAH:

Type d'échantillon:  Muscle          Date du prélèvement:   21-06-2006
Date de réception:  26-06-2006       Heure du prélèvement:

Résultats:

**Taux moyen d'alcool: 0.13 grammes pour mille.**
Intervalle de confiance: [0.08 ; 0.18] grammes pour mille.

Remarque:

Dr. Marc Augsburger
Biologiste, Toxicologue
Responsable du laboratoire

Copie:  Prof Patrice Mangin, IUML, Rue du Bugnon 21, 1005 Lausanne

*Le présent rapport ne concerne que les échantillons soumis à l'analyse. Des précisions sur les méthodes d'analyses
utilisées peuvent être obtenues sur demande.*

*Les échantillons seront encore conservés pendant une année après la date de remise du présent rapport. Passé ce
délai, et sauf avis contraire explicite de votre part, l'échantillon sera détruit.*

*Ce rapport ne peut pas être reproduit partiellement. L'utilisation de résultats individuels est autorisée si leur source est
citée.*

Etat de Vaud - Hospices cantonaux
Département Universitaire et de Santé communautaires
Université de Lausanne - Faculté de Médecine



Laboratoire de toxicologie et chimie forensiques
Responsable : Marc Augsburger, Dr ès Sc.

Directeur : Professeur Patrice Mangin
Rue du Bugnon 21, CH - 1005 Lausanne, Suisse
Tél : 41 21 / 314 70 70 - Fax : 41 21 / 314 70 90
E-mail : IUML.Central@hospvd.ch

Accréditation
STS448

> Professeur
> Patrice Mangin
> Directeur de l'Institut Universitaire de
> Médecine Légale
> Rue du Bugnon 21
> 1005 Lausanne

Lausanne, le 29 juin 2006

**Concerne :**    **Rapport d'analyse TOX / 060626 – 35501**

**ALI ABDULLAH Ahmed, 1969**

**Recherche systématique de toxiques médicamenteux et de stupéfiants
dans les échantillons biologiques**

---

## I.    ECHANTILLONS

Le 26 juin 2006, nous avons reçu les échantillons suivants, prélevés au cours de l'autopsie
M0600113 :

- 3 fois env. 5 ml sang fluoré de la cavité thoraco-abdominale
- env. 5 ml de sang EDTA de la cavité thoraco-abdominale
- des échantillons de foie, de rein, de muscle squelettique, de cortex cérébral
- des cheveux

      

## II.    RESULTATS

### II.1.    Tests préliminaires

Résultats des tests préliminaires (tests immunologiques) effectués sur le sang :

| Substance | Résultat | Cut-Off |
|---|---|---|
| Amphétamines | non détecté | 25 ng équivalents d-amphétamine/ml |
| Barbituriques | non détecté | 20 ng équivalents sécobarbital/ml |
| Benzodiazépines | non détecté | 10 ng équivalents oxazépam/ml |
| Buprénorphine | non détecté | 0.5 ng équivalents buprénorphine/ml |
| Cannabis | non détecté | 5.0 ng équivalents acide $\Delta^9$-THC-9-carboxylique/ml |
| Cocaïne | non détecté | 20 ng équivalents benzoylecgonine/ml |
| LSD | non détecté | 1.0 ng équivalents LSD/ml |
| Méthadone | non détecté | 10 ng équivalents méthadone/ml |
| Opiacés | non détecté | 10 ng équivalents morphine/ml |

❑    Autre test préliminaire effectué sur le sang :

Cyanure        non détecté

### II.2.    Screenings, confirmations et dosages

Lors des analyses qualitatives effectuées par CPG-SM, les toxiques volatils et non-volatils basiques, acides et neutres sont recherchés (en principe, les drogues, "designer drugs", poisons, pesticides, agents dopants, solvants et autres polluants ainsi que leurs métabolites mentionnés dans les bibliothèques Pfleger, Maurer et Weber (éd. 2000), Wiley7N, AAFS2000, NIST98 et IUML_Tox).

### II.2.1. Foie

❑    Les analyses qualitatives effectuées par CPG-SM ont démontré la présence des substances suivantes :
-    **Caféine et théobromine**

### II.2.2. Sang

❑    Les analyses qualitatives effectuées par CPG-SM n'ont pas mis en évidence la présence des substances recherchées.

❑  Les analyses qualitatives effectuées par HS-CPG-DIF ont démontré la présence des substances suivantes (N°ALC-35502) :
- **Ethanol**
- **Acétone**
- **1-Propanol**
- **2-Butanol**

❑  Les analyses quantitatives effectuées par HS-CPG-DIF ont donné les résultats suivants (N°ALC-35502) :

Ethanol :        0.18  g/kg (intervalle de confiance : 0.13 – 0.23 g/kg)

## II.2.3. Muscle

❑  Les analyses qualitatives effectuées par HS-CPG-DIF ont démontré la présence des substances suivantes (N°ALC-35503) :
- **Ethanol**
- **Acétone**
- **1-Propanol**
- **2-Butanol**

❑  Les analyses quantitatives effectuées par HS-CPG-DIF ont donné les résultats suivants (N°ALC-35503) :

Ethanol :        0.13  g/kg (intervalle de confiance : 0.08 – 0.18 g/kg)

## III.    DISCUSSION

## III.1.  Remarque

Certaines substances mises en évidence lors des analyses, à savoir l'éthanol, l'acétone, le 1-propanol, ainsi que le 2-butanol, peuvent apparaître lors de l'altération cadavérique.

## IV.   CONCLUSION

Les analyses des échantillons biologiques prélevés lors de l'autopsie M0600113 pratiquée sur **Ahmed ALI ABDULLAH (TOX-35501, ALC-35502 et ALC-35503)** indiquent la présence dans le sang d'alcool éthylique (éthanol), d'acétone, de 1-propanol et de 2-butanol. Dans le foie, de la caféine et de la théobromine ont été mises en évidence. En outre, dans le muscle squelettique, de l'alcool éthylique (éthanol) a été mis en évidence.

Certaines substances mises en évidence lors des analyses, à savoir l'éthanol, l'acétone, le 1-propanol, ainsi que le 2-butanol, peuvent apparaître lors de l'altération cadavérique.

*En tenant compte des limites de sensibilité des techniques analytiques mises en oeuvre, les analyses des principaux échantillons biologiques à disposition n'ont pas révélé la présence d'autres toxiques, stupéfiants ou médicaments courants en quantités qui peuvent être considérées comme significatives sur le plan toxicologique. Le présent rapport ne concerne que les échantillons soumis à l'analyse. Des précisions sur les méthodes d'analyses utilisées, en particulier concernant leur incertitude de mesure, peuvent être obtenues sur demande. Les échantillons seront encore conservés pendant 12 mois après la date de remise du présent rapport. Passé ce délai, et sauf avis contraire explicite de votre part, l'échantillon sera détruit. Ce rapport ne peut pas être reproduit partiellement. L'utilisation de résultats individuels est autorisée si leur source est citée.*

**Frank Sporkert**, Dr. rer nat.
*Chimiste analyste*
*Adjoint du responsable du laboratoire*

**Marc Augsburger**, Dr ès Sc.
*Biologiste, Toxicologue*
*Responsable du laboratoire*



Institut universitaire de médecine légale

Laboratoire de génétique forensique
Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : +41 21 / 314 70 70 ; Fax : +41 21 / 314 70 90
E-mail : IUML.Central@hospvd.ch

STS 420

Monsieur le Professeur
Patrice Mangin
IUML

*N/Réf. : P06-00068 – cas*

Lausanne, le 28 juin 2006

**Concerne : Détermination de l'origine d'un échantillon de sang par des analyses
de génétique forensique**

Monsieur le Professeur,

Le 26 juin 2006, nous avons reçu de l'unité de médecine forensique du sang sur papier
FTA et un morceau de muscle prélevés sur un corps de sexe masculin ayant fait l'objet
de l'autopsie M0600113.

Notre mission était d'établir et de confronter les profils ADN établis à partir de ce
matériel ainsi que de confirmer la nature du matériel analysé.

Nous avons répondu à votre demande. Vous trouverez ci-après notre rapport.

*Matériel à analyser*

Le 23 juin 2006, nous avons reçu du sang sur papier FTA et un morceau de muscle
prélevés sur le corps de ALI ABDULLAH Ahmed, né le 09.03.1969 (autopsie
M0600113).

*Méthodes*

L'ADN des échantillons a été extrait, puis amplifié par PCR (Polymerase Chain
Reaction) au moyen du kit PowerPlex16 (Promega) en suivant les instructions du
fabricant. Ce dernier permet l'analyse simultanée de 15 locus génétiques indépendants
les uns des autres ainsi que la détermination du sexe de la personne source de
l'échantillon (amélogénine). Finalement, le profil génétique est obtenu en analysant
l'ADN précédemment amplifié au moyen d'un appareil d'électrophorèse capillaire. Les
analyses ont été effectuées à double selon les directives de la Société suisse de

Institut universitaire de médecine légale
Laboratoire de génétique forensique
Rue du Bugnon 21, CH-1005 Lausanne, Suisse
Tél : +41 21 / 314 70 70 ; Fax : +41 21 / 314 70 90
E-mail : IUML.Central@hospvd.ch

Médecine légale. Nous avons également analysé le sang reçu au moyen du test Seratec HemDirect qui est un test immunochromatographique permettant de détecter la présence d'hémoglobine humaine ou de primate.

### Résultats

Les analyses effectuées à double à l'Institut universitaire de médecine légale de Lausanne ont donné des profils identiques pour les marqueurs génétiques examinés. En particulier, un même profil masculin de 15 locus a été obtenu pour le sang et pour le muscle prélevés sur le corps ayant fait l'objet de l'autopsie M0600113. Le test Seratec HemDirect a donné un résultat positif, ce qui signifie que de l'hémoglobine a été détectée.

### Conclusions

Les profils ADN obtenus pour le sang et le muscle prélevés sur le corps ayant fait l'objet de l'autopsie M0600113 présentent les mêmes caractéristiques génétiques. La valeur probante de ce résultat analytique a été évaluée en fonction des deux hypothèses suivantes :

- H1 : le sang et le muscle proviennent tous deux du corps autopsié
- H2 : le sang et le muscle proviennent de deux personnes non apparentées

Le rapport de vraisemblance calculé selon les fréquences des allèles dans la population suisse est supérieur à 10'000'000, ce qui signifie qu'il est environ 10'000'000 de fois plus probable d'observer ces profils si le sang et le muscle proviennent tous deux du corps autopsié plutôt que de deux personnes différentes.

**Nos résultats d'analyses soutiennent donc très fortement l'hypothèse selon laquelle le sang et le muscle proviennent tous deux du corps ayant fait l'objet de l'autopsie M0600113.**

Restant à votre disposition pour tout renseignement complémentaire, nous vous prions de croire, Monsieur le Professeur, à l'expression de notre parfaite considération.

C. SIMILI
Biologiste

V. CASTELLA
Biologiste, Dr ès Sc.

**Important** : le présent rapport n'est valide que pour les échantillons analysés et dans les limites de sensibilité des méthodes d'analyse utilisées. Des précisions sur ces dernières peuvent être obtenues sur demande. Tout ou partie de ce rapport ne peut être reproduit sans autorisation écrite du laboratoire. Une copie du présent rapport sera conservée pendant au moins cinq ans à notre institut. Le solde du matériel sera conservé pendant 1 année à compter de la date d'envoi du présent rapport. Passé ce délai, et sauf avis contraire de votre part, ce matériel sera détruit.

**INSTITUT UNIVERSITAIRE DE MEDECINE LEGALE**
**Unité d'odontostomatologie médico-légale**
**rue du Bugnon 21**
**1005 LAUSANNE**

Lausanne, le 27 juin 2006

## RAPPORT D'EXAMEN ODONTOSTOMATOLOGIQUE POSTMORTEM
## SUR LA BASE DE DOCUMENTS PHOTOGRAPHIQUES

Cadavre **M0600113**

Identité transmise : **Ahmed Ali Abdullah, 03.09.69**

**Examen demandé par :** Prof. Patrice Mangin, Dr Beat Horisberger, Dresse Bettina Schrag,
médecins légistes

**Examen effectué par :** Dr Michel Perrier MER, odontologiste consultant

**Date de l'examen:** 27.06.06

**Documents photographiques fournis par :**

- Drs Beat Horisberger et Bettina Schrag, médecins légistes

**Renseignements AM :**

- aucun

**Relevé PM**

- 11 photographies postmortem

## A. Constatations

### 1. Maxillaire :

- lésion horizontale du bord vermillon (env. 1.5 cm) située sur la partie droite de la
lèvre supérieure
- faces vestibulaires dentaires visibles: 13, 12, 11, 21, 22, 23
- signes discrets de gingivite et de colorations

- sulcus gingival régulier présentant par endroits (12, 11, 21, 22) un érythème pouvant évoquer une subluxation dentaire d'origine traumatique
- muqueuse alvéolaire légèrement hypertrophique
- aucun signe apparent de parodontite
- 22 : bord incisif ébréché (lésion de caractère récent au vu de la netteté du trait de fracture)
- 23 : attrition manifeste du bord incisif

## 2. Mandibule :

- faces vestibulaires dentaires visibles: 33, 32, 41, 42, 43
- signes de gingivite avec colorations et discrets dépôts de tartre
- pas de signe apparent de parodontite
- 41 : fracture de l'angle mésial; caractère récent de l'événement difficile à évaluer
- 31 : dent manifestement désarticulée (éventuel vestige radiculaire non visible), associée à une déchirure localisée de la muqueuse qui s'étend en direction vestibulaire et au-delà de la ligne muco-gingivale avec béance de l'alvéole dentaire ne présentant aucun signe de cicatrisation ou de granulation. La lésion évoque un traumatisme dentaire récent et violent, probablement en direction vestibulaire (vers l'extérieur) avec destruction apparente de la paroi osseuse alvéolaire externe. Il n'est pas exclu que la fracture de l'angle mésial de la dent 41 soit associée à ce traumatisme. Les documents photographiques disponibles ne permettent cependant pas d'étayer cette dernière hypothèse.

## B. Conclusions

Sur la seule base de documents photographiques, le soussigné constate la présence de traumatismes récents sur les dents suivantes :

1. dent 22 : ébréchure récente du rebord incisif ;
2. dents 12, 11, 21, 22 : érythèmes sulculaires localisés susceptibles d'évoquer des signes de subluxation dentaire ;
3. dent 31 : exarticulation traumatique dont l'examen indique que l'événement est intervenu juste avant la mort ou dans un intervalle périmortem ;
4. dent 41 : fracture de l'angle mésial difficile à évaluer dans le temps mais susceptible d'être associée à l'exarticulation de la dent 31.

L'ensemble de ces constatations a été effectué sur la base de documents photographiques uniquement. Les lésions constatées semblent compatibles avec un événement traumatique intervenu juste avant la mort ou dans un intervalle périmortem.

Dr Michel Perrier
médecin-dentiste consultant

# Renseignements communiqués par l'Organisation « Alkarama for Human Rights »

Selon les renseignements obtenus de l'Organisation « Alkarama for Human Rights », le 10 juin 2006, trois personnes sont décédées dans le camp de détention de Guantanamo, à savoir Ahmed ALI ABDULLAH, de nationalité yéménite et deux ressortissants souadiens.

L'Organisation « Alkarama for Human Rights » a été sollicitée par la famille de la victime pour l'assister dans l'organisation d'une deuxième autopsie du corps, en particulier pour savoir si l'hypothèse du suicide pourrait être confirmée ou infirmée.

Concernant Ahmed ALI ABDULLAH , l'organisation nous donne les renseignements suivants : il était détenu depuis 4 ans à Guantanamo. La famille n'avait pas eu de contact avec lui. Les parents avaient envoyé deux lettres, sans réponse. Le père récuse le diagnostic de suicide avancé par les autorités américaines. En effet, le suicide est prohibé par la religion islamique et donc contraire aux convictions religieuses de son fils. De plus, un autre de ses fils est toujours détenu à Guantanamo.

Concernant les deux ressortissants saoudiens, il nous a été communiqué que leurs corps avaient fait l'objet également d'une autopsie à la demande des autorités saoudiennes.

Le Dr Saeed G. Al-Ghamdy, directeur de l'institut de médecine légale de Riyadh, nous a communiqué qu'il avait effectivement procédé aux autopsies et qu'il s'était adressé aux autorités américaines pour compléter ses informations notamment quant aux circonstances de découverte des corps et aux investigations médicales et médico-légales pratiquées sur place et avant la remise des corps aux familles.

# Discussion

La discussion se base sur les renseignements reçus de l'Organisation « Alkarama for Human Rights », ainsi que sur les résultats des investigations médico-légales, en particulier la deuxième autopsie médico-légale effectuée par l'équipe de l'Institut universitaire de médecine légale de Lausanne 11 jours après le décès.

Lors de la deuxième autopsie nous avons principalement mis en évidence des signes de violence contre le cou, sous la forme :

- d'un sillon aux deux tiers circulaire, ascendant vers l'arrière
- d'une suffusion hémorragique du muscle sterno-cléïdo-mastoïdien droit
- d'une suffusion hémorragique du tissu fibro-adipeux située juste sous l'angle mandibulaire gauche.

D'autre part, nous avons constaté deux traces d'injection/ponction avec ecchymose au niveau du membre supérieur droit (pli du coude et dos de la main), ainsi qu'une exarticulation fraîche de la première incisive inférieure gauche avec suffusion hémorragique en regard. Ces lésions sont toutes vitales, ce qui signifie que l'intéressé les a subies de son vivant.

Lors de l'autopsie, nous avons constaté que le corps de l'intéressé avait déjà fait l'objet d'une première autopsie, comportant les ouvertures des trois cavités, de la face dorsale du tronc et des faces antérieures et postérieures des membres, éviscération complète et restitution des viscères dans un sac en plastic, à l'exception de certains organes ou parties d'organes (voir ci-dessus), section des organes et parties d'organes.

Il est par ailleurs nécessaire de souligner les limites de l'interprétation médico-légale, résultant d'une part d'un début d'altération postmortem, et d'autre part des remaniements induits par la première autopsie, entraînant l'impossibilité de prélever certains échantillons biologiques en vue d'analyses toxicologiques (notamment sang périphérique et urine), et l'impossibilité d'examiner certains d'organes ou de parties d'organes, tel que le larynx avec son squelette.

Sur la base des éléments actuellement à notre disposition, la cause du décès la plus vraisemblable est une asphyxie mécanique consécutive à une violence exercée contre le cou. Cette asphyxie est compatible avec une pendaison, sans cependant pouvoir exclure formellement un autre mécanisme de violence (par exemple strangulation), seul ou combiné avec la pendaison.

Les lésions odontostomatologiques constatées, en particulier l'exarticulation fraîche de l'incisive inférieure à gauche, en l'absence de contusion des lèvres, nécessite impérativement de pouvoir accéder aux rapports établis par les autorités américaines. Les signes constatés in situ évoquent une origine traumatique et pourraient être, le cas échéant, consécutifs aux manœuvres de réanimation. Ils n'évoquent pas en revanche

un traumatisme contondant exercé contre la région buccale, faute d'autres lésions de violence associées (plaie contuse, ecchymose).

Concernant les traces d'injection/ponction avec ecchymose constatées au membre supérieur droit (pli du coude et dos de la main), les trois hypothèses peuvent être envisagées :

1) lésions survenues dans le cadre d'une tentative de réanimation

2) injection/ponction par un tiers avant le décès

3) injection/ponction par l'intéressé lui-même (hypothèse paraissant peu vraisemblable)

A noter que le corps présentait un état de nutrition et d'hygiène satisfaisant.

Les analyses de génétique forensique ont permis d'établir que le liquide rouge brunâtre recueilli dans la cavité thoraco-abdominale est du sang humain et qu'il provient bien du corps dont l'identité nous avait été communiquée comme étant celle de ALI ABDULLAH Ahmed.

En l'absence de sang périphérique, les analyses toxicologiques ont été effectuées sur l'échantillon de sang recueilli dans les cavités thoraco-abdominales. Les résultats de ces analyses indiquent la présence dans le sang d'alcool éthylique à un taux moyen de 0.18 g/kg, d'acétone, de 1-propanol et de 2-butanol, ceci en l'absence de toute autre substance d'intérêt médico-légal. Selon toute vraisemblance, ces substances ont été produites dans le cadre du processus d'altération cadavérique constatée lors de la deuxième autopsie. Par conséquent, au moment du décès, l'intéressé n'était vraisemblablement pas sous l'influence de substances médicamenteuses ou de stupéfiants.

Concernant les circonstances du décès, il y a lieu de relever un certain nombre de points nécessitant un complément d'informations en effet :

- les parties du sillon cervical qui sont bien délimitées et étroites (parties latérales) ne sont pas habituellement observées avec le mode opératoire indiqué (utilisation de drap et d'habits comme moyen de pendaison),

- les hémorragies des plans sous-jacents du cou ne coïncident pas formellement avec le sillon constaté en regard au niveau de la peau,

- Il existe d'autres lésions traumatiques ailleurs qu'au niveau du cou, en particulier une exarticulation fraîche de la première incisive inférieure gauche et la présence de traces d'injection/ponction au niveau du membre supérieur droit pour autant qu'elles n'entrent pas dans le cadre d'une tentative de réanimation ou d'une autoagression.

A la date actuelle et sous réserve des éléments précédemment cités, l'ensemble de nos investigations ne paraît néanmoins pas incompatible avec l'hypothèse d'un suicide par pendaison, sans pouvoir exclure de façon absolue, une autre éventualité. A cet effet,

nous avons adressé une demande d'informations complémentaires auprès des autorités américaines (cf lettre en annexe). A ce jour, nous ne disposons pas des informations demandées. Nous nous réservons ainsi le droit de reconsidérer nos conclusions en fonction des informations qui nous seraient communiquées.

Il convient d'observer que nos collègues saoudiens en charge de la seconde autopsie des deux autres détenus ont également manifesté le besoin d'obtenir un complément d'information allant dans le même sens que nous.

En tout état de cause, une évaluation des conditions de détention nous paraît indispensable. Celle-ci n'est toutefois pas du ressort des experts médico-légaux.

## **Conclusions**

1) Lors de nos investigations, nous avons mis en évidence essentiellement des signes de violence au niveau du cou (sillon, hémorragie des plans musculaires et fibro-adipeux), deux traces d'injection/ponction avec ecchymoses au membre supérieur droit et une exarticulation fraîche de la première incisive inférieure gauche.

2) La cause du décès est selon toute vraisemblance la conséquence d'une asphyxie mécanique par une violence exercée contre le cou dans le cadre d'une pendaison, sans pouvoir exclure formellement un autre mécanisme.

3) Les traces d'injection/ponction avec ecchymoses au membre supérieur droit ainsi le traumatisme dentaire devraient pouvoir s'expliquer par des manœuvres de réanimation. Dans le cas contraire, elles constitueraient un élément de suspicion quant aux circonstances du décès.

4) Les analyses toxicologiques n'ont pas mis en évidence de médicaments ou de stupéfiants susceptibles d'interférer avec le décès ou les circonstances de survenue de celui-ci.

5)    En l'état actuel de nos investigations, des informations à notre disposition et sous réserve du point 3, nos constatations ne sont pas incompatibles avec l'hypothèse d'un suicide par pendaison.

6)    Dans cette hypothèse, et pour tenir compte des objections avancées par la famille, il y aurait lieu de s'interroger sur le rôle des conditions de détention dans la survenue de cet acte d'autoagression.

7)    A la date de la présente expertise, les informations demandées aux autorités américaines ne nous ont pas été communiquées.

Restant à votre disposition pour tout renseignement complémentaire, nous vous prions de croire, Maître, à l'assurance de notre parfaite considération.

Dr B. HORISBERGER
Médecin hospitalier

Professeur P. MANGIN

Dresse B. SCHRAG
Médecin assistant

Annexe : lettre du 29 juin 2006, adressée au Dr Craig T.Mallak par Maître Rachid Mesli, à la demande du Prof. Patrice Mangin

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH - 1005 Lausanne
Tél: 41 213147070 - Fax: 41213147090
E-mail: IUML.Central@hospvd.ch

Mr. Rachid Mesli
Alkarama for Human Rights
2 bis Chemin des Vignes 1209
Geneva

Lausanne, 20th July 2006

*N/ref.* ***M0600113***
***PM/BH/BS/dc***

**Re:**     **ALI ABDULLAH Ahmed, born 09.03.1969 – 2nd medicolegal autopsy**

Dear Sir,

In your letter of 19th June 2006, you commissioned us, at the family's request, to carry out a second medicolegal autopsy on the body of a person whose identity was communicated to us as that of ALI ABDULLAR Ahmed, aged 37 years old.

We have fulfilled your request. Please find attached our report, which is based on:

a)   the medicolegal autopsy (2nd autopsy) carried out by the team at the University Institute of Legal Medicine, Lausanne, Switzerland

b)   histological examinations

c)   toxicological analyses

d)   forensic genetic analyses

e)   the medicolegal odontostomatological examination

f)   the information provided by the organisation "Alkarama For Human Rights"

Etat de Vaud - Hospices cantonaux· CHUV
Département universitaire de Médecine et de Santé communautaires
Université de Lausanne – Faculté de Médecine

# Report of the 2nd medicolegal autopsy

Report of the medicolegal autopsy on the body whose identity was reported to us as being that of

**ALI ABDULLAH Ahmed**, born 09.03.1969, and whose death was recorded on 10.06.2006 at the Guantanamo Bay detention camp,

carried out 21st June 2006, beginning at 16:30, in the morgue at the Sanaa Military Hospital (Yemen) by Professor P. MANGIN, Director of the University Institute of Legal Medicine of Lausanne, Dr. B. HORISBERGER and Dr. B. SCHRAG, with the assistance of Mr. Giudo TESTORI, assistant, and in the presence of the Deputy Prosecutor of Sanaa, and Drs. Fouad ALKAHIN, Muktar ALHARANI and Abdul-Rab ALARIGI.

---

## A. External Examination

1.  The body is that of a man who appears the recorded age of 37 years old, is of robust constitution, is in good nutritional health and measures 164cm. The man is of average build. The body arrived naked, wrapped in a white cotton sheet and in a black plastic body bag closed with a zip. The body appears well preserved and shows no signs of decomposition. It has apparently been preserved by freezing. On the day of the autopsy, the body was still cold and partially frozen, and it was necessary to delay proceedings by five hours in order that the autopsy could be carried out properly.

2.  Rigor mortis has disappeared from the four limbs as well as from the temporomandibular joints.

3.  The skin is tanned and shows normal levels of nutrition and hydration. There is no specific pigmentation. On the dependent areas corresponding to a dorsal decubitus, the body shows areas of lividity of a dark red colour that remain when pressed with a finger. These areas of lividity can also be seen on the rear face of both legs. The areas upon which the body rests are not affected.

4.  The body shows evidence of post-mortem intervention in the form of sutured linear incisions that are primarily consistent with a medicolegal autopsy. These incisions can be found:

    on the front of the trunk – a large "Y" shaped incision, whose vertical branch measures 41cm and which extends along the median line of the

    area above the pubic region to a horizontal line that passes 3cm above the mamillary line; here the incision divides into the two slanted branches of the "Y" in a symmetrical fashion towards the frontal part of the two shoulders, then continues for 60cm along the anteroexternal face of the upper right limb where it stops at the dorsal face of the wrist and for 60cm along the anteroexternal face of the upper left limb where it stops at the dorsal face of the corresponding wrist,

on the vertical branch dissecting the abdomen, the incision includes another, perpendicular branch 6.5cm above the umbilicus, which extends 4cm to the right,

on the upper right limb, there is another post-mortem incision that extends along the posterointernal face, starting at the posterior region of the corresponding shoulder and finishing at the anterior face of the right wrist, covering a length of 70cm,

on the upper left limb, the same post-mortem incision as above can be found along the posterointernal face, with a length of 70cm extending from the posterior region of the corresponding shoulder and finishing at the anterior face of the left wrist,

on the lower third of the right forearm, there are seven sutured, linear, vertical, parallel, post-mortem incisions that cover the entire circumference and measure up to 7.5cm in length,

on the lower third of the left forearm, six of the same type of post-mortem incisions can be found, measuring up to 8cm in length,

on the lower limbs, there is a large, vertical, linear, post-mortem incision on the left extending from the inguinal region, along the anterior face of the thigh, knee and leg and finishing at the ankle, measuring 80cm in length,

on the lower right limb, the same type of incision can be found, extending from the inguinal region to the ankle, along the anterior face of the thigh, knee and leg, measuring 85cm in length,

on the posterior face of the trunk and lower limbs, there are two large, vertical, linear, parallel, paramedian, post-mortem incisions to the left and right that extend symmetrically from the right and left posterior scapular regions to the homolateral gluteal regions and then along the posterior faces of the two legs, both finishing above

the heels; the right paramedian incision measures 141cm; the left paramedian incision measures 139cm,

on the lower third of the lower right limb, there are seven vertical, linear, sutured, parallel, post-mortem incisions that cover the entire circumference of the limb and measure up to 16 cm in length,

on the lower third of the lower left limb, there are six vertical, linear, sutured, parallel, post-mortem incisions that cover the entire circumference and measure up to 13 cm in length,

on the cephalic extremity, there is a "horseshoe" shaped post-mortem incision extending from one mastoid region to the other at the level of the parietooccipital junctions and measuring 36cm in length; there is also another sutured post-mortem incision in the right suboccipital region, along the base of the cranium, measuring 5cm in length and located in an area of parchment-like skin measuring 5.5cm x 3cm,

on the lower half of the posterior section of the neck there is a vertical post-mortem incision along the median line, extending to the upper thoracic region, measuring 21cm in length; this incision line curves slightly to the right in the lower section.

5.  The head is oval-shaped and there is abnormal mobility in the cranial skullcap as a result of a previous autopsy, as demonstrated by the multiple post-mortem incisions described above. The hair is black in colour and an average of 3 cm long. To recap, the scalp has been subject to a "horseshoe" shaped incision from one mastoid region to the other. Below and behind this incision, the scalp has been shaven to a height of 3cm, as has the low median occipital region over an area measuring 10cm x 4cm. In addition, there are two areas of parchment-like skin, both of which appear to be post-mortem in nature, one of which measures 1.5cm x 1cm and the other 5cm x 2cm. The larger of these two areas of parchment-like skin is located in the median occipital region, and the smaller in the left retromastoid region. In the right retromastoid region, there are three other areas of parchment-like skin, measuring 0.7cm in diameter, 1cm x 0.7cm and 1cm x 1.7cm respectively. To recap, there is a post-mortem incision along the base of the cranium in the suboccipital region, measuring 5cm and located in an area of parchment-like skin that measures 5.5cm x 3cm.

6.  The skin on the face is pale and does not show signs of engorgement. There is a beard with black hair measuring between 2cm and 3cm in length.

7.    The facial skeleton is intact.

8.    The eyes are closed. The ocular globes are sunken. Hyperaemia was observed in the conjunctives, without any visible characteristic petechiae. The sclerae show no distinctive features. The corneae are cloudy. The pupils are no longer visible. The colour of the iris is difficult to determine. There is an area of parchment-like skin of 0.5cm in diameter below the external canthus of the left eye, in relation to the external orbit region.

9.    The nasal skeleton is intact. The nasal orifices are obstructed by two cotton swabs soaked in a brownish-red liquid.

10.   The lips are dehydrated, and the lower lip is markedly drier than the upper lip. In the lower dental arcade, the first incisor on the left (No. 31) is missing. There appears to be a contuse wound to the gums, with irregular edges, measuring 0.7cm tall and 0.3cm wide. This wound is surrounded by a zone of haemorrhagic suffusion extending to a width of 2.5cm to the gingivolabial sulcus (exarticulation of tooth No. 31). The rest of the dentition is in a satisfactory condition. There is a brownish liquid present at the bottom of the mouth orifice.

11.   The pinnae show no distinctive features. The external auditory canals are clear.

12.   On the neck there is a partially solid, brownish-red groove at the level of the median occipital region. This groove runs sideways from bottom to top and from front to rear. Its anterior section is situated on the lower third of the anterior face of the neck. At the posterior section, the virtual suspension point is located in the median occipital region. This groove is clearly visible in the lateral regions of the neck, where it is parchment-like and vanishes to the rear of the vertical section of the posterior insertion of the right ear and, to the left, at the vertical section of the corresponding mastoid, where it seems to continue through several areas of parchment-like skin, measuring 0.5cm in diameter. In terms of its laterocervical trajectory to the right and left, the groove is clearly delimited and measures 1cm tall. However, in the anterior section, it is considerably less well delimited for several centimetres and is less visible on the anterior face of the neck, where it extends to a maximum height of 2cm. The neck does not show any abnormal mobility, and there is no piston effect.

13.   The thoracic cage is of normal shape. Palpation of the rib cage reveals false mobility as a result of previous autopsy procedures.

14.   The abdomen is flat. On the right hip cavity there is a horizontal area of filiform parchment-like skin, measuring 0.5cm x 0.1cm.

15. The pubic region has been shaven. The external genital organs are normally developed. There is evidence of an old circumcision procedure. The testicles cannot be detected in the scrotum.

16. The skin on the back shows no distinctive features. There is a thin, vertical, slightly slanted scar at the level of the right posterior axillary line, measuring 3cm x 0.2cm, the top of which is located 17cm below the axillary hollow.

17. The upper right limb is in a normal position. There is an area of dermabrasion measuring 0.8cm x 0.4cm on the internal face of the elbow joint. This dermabrasion is dark red in colour and is slightly parchment-like. On the fold of the right elbow there is a large area of purple-red ecchymosis, measuring 8cm in height and 4.5cm in width, in which there is a punctiform wound measuring 2cm in diameter. On the superointernal section of the dorsal face of the right hand there is a poorly delimited area of dark red ecchymosis, measuring 6cm tall and 3cm wide. Under a magnifying glass, the centre of this area of ecchymosis contains a small orificial wound of less than 1mm in diameter. The fingernails on the right hand have been cut. The edges of the nails are therefore irregular and partially amputated, with small, related excoriations of the bed of each nail. The palmar region features a blackish pigmentation (fingerprint sampling).

18. The upper left limb is in a normal position. There is an area of linear, filiform, slightly slanted dermabrasion measuring 4cm in length and 0.2cm in width. There is further dermabrasion, parallel to the latter and 2cm above it, measuring 0.3cm long. The fingernails on the left hand have also been cut. The edges are irregular and partially amputated, and also feature small excoriations of the bed of each nail. There is pronounced ungueal cyanosis on both hands. The palmar region features a blackish pigmentation (fingerprint sampling).

19. The lower limbs are in a normal position. On the external face of the left hip there are several areas of parchment-like skin of a brownish-red colour, covering an area 6cm tall and 5cm wide, each measuring up to 1cm long and 0.2cm wide. On the upper half of the anteroexternal face of the left thigh there is a zone of discolouration covering an area 7cm tall and 4cm wide, marked by purple-blue convolutions measuring up to 1cm in length. The plantar faces of the two feet also show blackish pigmentation (footprint samples). The toenails have also been cut on both the right and left foot.

## B. Incisions into the skin and underlying tissues

### 20.    Nape of the neck

The nape of the neck was opened through the incision already present on the median line.

*Current condition:*

-    moderate post-mortem alteration of musculature

*Supplementary investigations:*

- lengthening of the incision along the median line from 2 to 3cm in the low occipital region

- longitudinal incisions into the musculature

- palpation of the spinous processes of the cervical column and the upper part of the thoracic column

*Observations:*

- absence of ecchymosis and haematoma

- no false mobility of spinal processes during palpitation

### 21.    Distal sections of the limbs

The distal sections of the limbs were opened through the incisions already present.

### *22.    Distal third of the right forearm*

*Current condition:*

-    7 longitudinal incisions affecting the skin and subcutaneous tissue, partially opening the muscular fasciae

*Observations:*

- absence of ecchymosis and haematoma in the cutaneous, sub-cutaneous and muscular layers

### 23.  *Distal third of the left forearm*

*Current condition:*

- 6 longitudinal incisions affecting the skin and subcutaneous tissue, partially opening the muscular fasciae

*Observations:*

- absence of ecchymosis and haematoma in the cutaneous, sub-cutaneous and muscular layers

### 23.     *Distal third of the right leg*

*Current condition:*

- 7 longitudinal incisions affecting the skin and subcutaneous tissue, partially opening the muscular fasciae

*Observations:*

- absence of ecchymosis and haematoma in the cutaneous, sub-cutaneous and muscular layers

### 24.     *Distal third of the left leg*

*Current condition:*

- 6 longitudinal incisions affecting the skin and subcutaneous tissue, partially opening the muscular fasciae

*Observations:*

- absence of ecchymosis and haematoma in the cutaneous, sub-cutaneous and muscular layers

### 25.     *Fold of the right elbow*

*Current condition:*

- fresh punctiform wound surrounded by an area of ecchymosis

*Supplementary investigations:*

- incision into the skin and sub-cutaneous tissue
- sample: skin neighbouring the punctiform wound

*Observations:*

    - haemorrhagic suffusion in the sub-cutaneous tissue

## 26.    *Back of the right hand*

*Current condition:*

    - punctiform wound surrounded by an area of ecchymosis

*Supplementary investigations:*

    - incision into the skin and sub-cutaneous tissue

    - sample: skin neighbouring the punctiform wound

*Observations:*

    - haemorrhagic suffusion in the sub-cutaneous tissue

# c. Opening the cavities and neck examination

## 27.    Cranial cavity

The cranium was opened through the incision already present.

*Current condition:*

    - to recap: incision into the scalp measuring approximately 36cm in length, in a concave "horseshoe" shape towards the rear, extending from one mastoid process to the other

    - opening of the skull along the base of the cranium

    - the skullcap is fixed with a suture line with several crossed sutures from one temporal muscle to the other

    - the dura mater has been detached and removed

    - the cranial cavity has been completely emptied

    - there is partial opening of the median section of the anterior stage of the base of the cranium at the level of the sphenoid and ethmoid bones

*Supplementary investigations:*

    - incisions into the temporal muscles

    - incisions into the aponeurotic galea

*Observations:*

    - scalp: reddish in colour, of average thickness

    - scalp and temporal muscles: absence of ecchymosis and haematoma

    - dura mater: absent

    - skullcap: 14.8cm x 17.5cm in diameter, between 0.3 and 0.9cm thick, no false

mobility, no pathological transparency

    - base of the cranium: normal, three-stage configuration, no distinctive features except for the opening of the median section of the anterior stage (see above)

    - the pituitary gland cannot be observed

## 29. **Thoracoabdominal cavity**

The thoracoabdominal cavity was opened through the incision already present on the median line.

*Current condition:*

    - section of the lower abdomen

    - presence of an orange plastic bag containing entrails

    - thoracoabdominal cavity: has been completely emptied; once the plastic bag is

removed, there are several millilitres of brownish liquid (blood?) in the thoracic and

lumbar lateral vertical grooves

*Supplementary investigations:*

    - opening of the vertebral column

    - breaking of the ribs and collarbones

    - incisions into the psoas muscles

    - samples taken: psoas muscles

*Observations:*

    - thoracic and abdominal adipose layer: rather thin

     musculature of thoracoabdominal inner walls: absence of ecchymosis and haematoma

    - rib cage: elasticity consistent with age, no fractures

    - vertebral column: no vertebral fractures

- intervertebral discs: no haemorrhaging (absence of Simon's haemorrhages)
- pelvis: no fractures

## 30. Neck

The neck was opened with two incisions on the lateral faces.

*Current condition:*

- neck has been emptied

*Supplementary investigations:*

- incision into the right lateral face, extending from the right shoulder to the right mastoid region

- incision into the left lateral face, extending from the left shoulder to the left mastoid region

- incisions into the platysma as far as the lower dental arcade

- incisions into the pre- and paravertebral musculature

- opening of the carotid arteries

- samples taken: fragment of skin from the groove, fragment of fibrous-adipose tissue from the left, fragment of the right sternocleidomastoid muscle

*Observations:*

- circumference of the neck: 39.5 cm

- fibrous-adipose tissue: with respect to the groove mentioned above, in the left lateral-cervical region, just below and slightly behind the mandibular angle, there is haemorrhagic suffusion measuring 2.5cm wide, 2cm tall and 0.3cm deep

- musculature: with respect to the same parchment-like groove, in the right lateral-cervical region, at the level of the rear section of the upper half of the sternocleidomastoid muscle, there is haemorrhagic suffusion measuring 3cm wide, 6.5cm tall and 1.5cm deep

- pre- and paravertebral musculature: absence of ecchymosis and haematoma

- fibrous-adipose musculature and tissue relating to the upper edge of the median section of the mandible and the lower dental arcade: absence of ecchymosis and haematoma

- carotid arteries: slight signs of arteriosclerosis, especially in the bifurcations of the carotid arteries

- vertebral column: no distinguishing features under palpation

## D. Examination of the entrails

31.  The orange plastic bag mentioned above contained the following entrails:

**32.    Brain**

*Current condition:*

    - cut into slices

*Supplementary investigations:*

    - samples taken: cortex, cerebellum

*Observations:*

    - cortex, cerebellum: partially identifiable

    - consistency: flaky to mushy

    - colour: grey to pink

    - no solid tumours, no haemorrhaging, no foreign bodies

## 33. Organs of the neck

### *34. Tongue*

*Current condition:*

    - separated from the neck entrails

    - has undergone transverse section

*Observations:*

    - texture: normal

    - absence of ecchymosis and haematoma

### *35. Thyroid*

*Current condition:*

    - fragments of thyroid parenchyma

*Supplementary investigations:*

    - sample taken: fragment of parenchyma

*Observations:*

    - parenchyma: dark, homogeneous, no haemorrhaging

### 36. *Trachea*

*Current condition:*

    - only the lower third is present, with identifiable bifurcation

    - membrane section is open

*Observations:*

    - absence of ecchymosis and haematoma

    - mucous: brownish-red, autolysis

### 37. **Organs of the thorax**

### 38. *Pericardium*

*Current condition:*

    - partially present

    - dark red

*Observations:*

    - no lesions

### 39. *Heart*

*Current condition:*

    - fragmented

    - partially dissected, separated

*Supplementary investigations:*

    - opened from the coronary arteries

    - samples taken: fragments of the inner ventricle walls

*Observations:*

    - myocardium: elastic, brownish-red, no fibrosis or infarction

    - thickness of the myocardium: 0.3cm in the right ventricle, 1.4cm in the left ventricle

- valvular system: limited to the aortic valve

- aortic valve: 6cm in circumference, supple

- coronary arteries: identifiable only at their origin, with a few isolated areas of arteriosclerosis

### 40. *Lung (bilobed)*

*Current condition:*

- moderate alteration

- incisions into the para- and perihilar regions

*Supplementary investigations:*

- opening of the pulmonary arteries

- opening of the bronchi

- finer incisions into the whole of the parenchyma

- sample taken: fragment of the pulmonary parenchyma

*Observations:*

- no subpleural petechiae

- pleura: smooth, shiny

- parenchyma: homogeneous, purple-blue colour, succulent

- pulmonary arteries: unobstructed, supple inner wall

- bronchi: unobstructed, dark red mucous

### 41. *Lung (trilobed)*

*Current condition:*

- moderate alteration

- incisions into the para- and perihilar regions

*Supplementary investigations:*

- opening of the pulmonary arteries

- opening of the bronchi

- finer incisions into the whole of the parenchyma

- sample taken: fragment of the pulmonary parenchyma

*Observations:*

- no subpleural petechiae

- pleura: smooth, shiny

- parenchyma: homogeneous, purple-blue colour, succulent

- pulmonary arteries: unobstructed, supple inner wall

- bronchi: unobstructed, dark red mucous

## 42. Abdominal organs

### 43. *Diaphragm*

*Current condition:*

- separated from the entrails

- partially present in the form of a large, detached fragment

*Observations:*

- homogeneous, purple-blue colour

- no distinctive features

### 44. *Spleen*

*Current condition:*

- organ present in its entirety

- cut into transverse slices

*Supplementary investigations:*

- sample taken: fragment of the parenchyma

*Observations:*

- size:  5cm x 8cm x 2.5cm

- capsule: thin

- surface: smooth

- parenchyma: homogeneous, dark red, diffluent

- structure: unrecognisable

*45. Liver*

*Current condition:*
- in several fragments
- cut entirely into slices

*Supplementary investigations:*
- samples taken: fragments of the parenchyma

*Observations:*
- capsule: thin
- surface: smooth
- parenchyma: brownish red, normal structure, elastic consistency, normal flakiness
- no signs of fibrosis or steatosis

*46. Kidneys*

*Current condition:*
- two kidneys present
- cut entirely into slices
- renal pelvises: open

*Supplementary investigations:*
- samples taken: parenchyma

*Observations:*
- surfaces: smooth
- parenchymae: flaccid, normal structure
- renal pelvises: supple

*47. Aorta*

*Current condition:*
- fragment of abdominal aorta up to the level of the iliac bifurcation
- longitudinal opening
- absence of renal arteries

*Supplementary investigations:*

    - measuring of circumference

*Observations:*

    circumference above the coeliac trunk: 4 cm

    circumference below the coeliac trunk: 3.5 cm

    - inner wall: supple

    - tunica intima: reddish colour, several isolated areas of

    arteriosclerosis

## 48. Stomach

*Current condition:*

    - present, with an opening along the greater curvature

*Observations:*

    - inner wall: no distinctive features

    - serous membrane: no distinctive features

    - mucous: blackish-brown, autolysis

## 49. Intestines

*Current condition:*

    - extracted as a whole from the abdominal cavity

*Supplementary investigations:*

    - opening of the intestines

*Observations:*

    - no distinctive features

    - appendix: unidentifiable

    - signs of autolysis

## 50. Bladder

*Current condition:*

    - cavity opened on anterior face

*Supplementary investigations:*

    - evaluation of the permeability of the meatuses to sound

*Observations:*

   - inner wall: normal structure

   - mucous: greyish-yellow, slight autolysis

   - trigone: normal aspect

   - meatuses: permeable


51. Absent or non-identified organs

The following organs could not be found or identified:

   - larynx and pharynx

   - thyroid cartilage

   - hyoid bone

   - upper section of the trachea

   - part of the neck musculature

   - cervical ganglions

   - oesophagus

   - renal lodges

   - mesentery
   - suprarenals

   - pancreas

   - gall bladder

   - prostate

   - testicles

   - appendix

   - pituitary gland



E. Samples

52. For toxicological analyses, we have taken a sample of the brownish-red liquid (blood?) in the thoracoabdominal cavities, the skeletal muscle (iliopsoas muscle from both sides), fragments of liver, kidney, cerebral cortex and a tuft of hair.

53. For histological examinations, we have taken the following tissue or
    organ fragment samples:

- fibrous-adipose tissue from under the left mandibular angle
- right sternocleidomastoid muscle
- right carotid artery
- left carotid artery
- trilobed lung
- bilobed lung
- left ventricle of the heart
- right ventricle of the heart
- liver
- spleen
- kidneys (left and right)
- cerebellum
- cerebral cortex
- skin from the groove on the neck
- injection/puncture mark in the fold of the right elbow
- injection/puncture mark on the back of the right hand

(SM-G)
(SC-D)
(C-D)
(C-G)
(P-D)
(P-G)
(VG)
(VD)
(F)
(R)
(RE)
(CV)
(CO)
(SI)
(IC)
(IM)

54. For genetic analyses, we have taken a sample of the skeletal muscle (iliopsoas muscle) and
    of the brownish red liquid (blood) in the thoracoabdominal cavity.


Dr. B. HORISBERGER                                    Professor P. MANGIN
Hospital doctor



Dr. B. SCHRAG
Assistant doctor

# **Histological examinations**

*Cerebellum*
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

The sample is a section cut from a cerebellum lobe. The general structure has been preserved. However, the beginning of very slight post-mortem alteration can be observed. There are no noticeable lesions. The reaction to Prussian blue is negative.

*Cerebral cortex*
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

The samples are from the cortical and subcortical regions.  The general structure has been preserved. The perivascular tissue of several vessels shows deposits of yellowish-brown pigmentations, the majority of which also show a slight infiltration of inflammatory mononuclear cells. The remainder shows no noticeable lesions. The reaction to Prussian blue is negative.

*Left ventricle of the heart*
*(haematoxylin-eosin and van Gieson colouration)*

The sample is a section of the inner wall of the ventricle. The general structure has been preserved. However, there are several slight basophilic masses of a post-mortem bacterial nature. The muscular fibres are arranged normally and are of average size. There are some post-mortem modifications (fragmentation) as well as some slight areas of contraction bands (type 1). The interstitial tissue shows no distinctive features. The epicardium and endocardium show no distinctive features.

*Right ventricle of the heart*
*(haematoxylin-eosin and van Gieson colouration)*

The sample is a section cut from the ventricle. The general structure has been preserved, but the beginnings of post-mortem alteration can be seen. There is subepicardial adipose tissue present in a more abundant quantity than in the left ventricle and extending as far as the muscular layer. The muscular fibres show slight undulation in places.

### Kidneys
*(haematoxylin-eosin and van Gieson colouration)*

There are samples of both kidneys (one sample per kidney). The general structure has been changed by the beginnings of post-mortem alteration, including the decrease or complete loss of colour of the fragments, particularly the epithelium of the uriniferous tubules, as well as by the beginnings of structure homogenisation, limiting any interpretation. However, there are no noticeable lesions.

### Liver
*(haematoxylin-eosin and van Gieson colouration)*

The sample is of a hepatic parenchyma. The general structure has been changed by the beginnings of post-mortem alteration, including the decrease in colour of the fragments and post-mortem modifications to the parenchyma, limiting any interpretation. However, there is no fibrosis, nor is there any inflammatory infiltration. The hepatocytes show hepatocyte clearing and, in places, slight vacuolisation (optically empty, mainly microvesicular vacuoles). The portal circulation areas showed no distinctive features.

### Spleen
*(haematoxylin-eosin and van Gieson colouration)*

The sample is of a splenic parenchyma. The general structure has been changed as a result of the beginnings of post-mortem alteration. However, there are no noticeable lesions in the white and red pulps.

### Trilobed lung
*(haematoxylin-eosin and van Gieson colouration)*

The sample is from the parenchyma of the trilobed lung. The general structure has been preserved. However, there are several basophilic masses of a post-mortem bacterial nature. The septa and alveoli are of a normal aspect. In the space within the alveoli, there are several squamous pneumocytes, and in places there is pale eosinophilic material (oedema). The capillaries are filled with red blood cells.

### Bilobed lung
*(haematoxylin-eosin and van Gieson colouration)*

The sample is from the parenchyma of the bilobed lung. The general structure has been preserved. However, there are several basophilic masses of a post-mortem bacterial nature. The septa and alveoli are of a normal aspect. In the space within the alveoli, there are several squamous pneumocytes, and in places there is pale eosinophilic material (oedema). The capillaries are filled with red blood cells.

### Skin from the groove on the neck
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

The sample is from the groove itself and the surrounding healthy skin. It includes the epidermis, dermis and hypodermis. The general structure has been preserved. In terms of the groove, the epidermis is thin, with nuclei that are denser, closer together and longer in shape than in the healthy skin. There are no signs of haemorrhagic suffusion either in the dermis or in the hypodermis. The reaction to Prussian blue is negative.

### Fibrous-adipose tissue from under the left mandibular angle
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

The sample contains adipose tissue interrupted by areas of fibrous tissue, layers of fibrous tissue, skeletal muscle and glandular parenchyma. The general structure has been preserved. There are extravasated red blood cells (haemorrhagic suffusions) within the fibrous-adipose tissue, although there is no inflammatory reaction. The glandular parenchyma shows no distinctive features. In terms of the skeletal muscle, there are several areas where the myocytes show contortion bands. The reaction to Prussian blue is negative.

### Right sternocleidomastoid muscle
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

The sample contains muscular fibres, separated in places by interstitial fibrous tissue. The general structure has been preserved. In places there are extravasated red blood cells (haemorrhagic suffusions), without any inflammatory reaction. In some places, the myocytes show type I and II contraction bands. The reaction to Prussian blue is negative.

### Right carotid artery
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

Three samples were taken. The general structure has been preserved. There is a vascular arterial-type wall, which shows no lesions except, in places, for very slight intimal thickening (of an atheromatous nature). It is of note that there is no haemorrhagic suffusion. The reaction to Prussian blue is negative.

***Left carotid artery***
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

Three samples were taken. The general structure has been preserved. There is a vascular arterial-type wall, which shows no lesions except, in places, for intimal thickening (of an atheromatous nature), which is more marked than in the sample from the right carotid artery. It is of note that there is no haemorrhagic suffusion. The reaction to Prussian blue is negative.


***Injection/puncture mark in the fold of the right elbow***
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

The sample is a transverse section containing the epidermis, dermis and hypodermis. The general structure has been preserved. The only noticeable lesion is the presence of extravasated red blood cells in the hypodermis, although there is no inflammatory reaction. The reaction to Prussian blue is negative.


***Injection/puncture mark on the back of the right hand***
*(haematoxylin-eosin, van Gieson and Prussian blue colouration)*

The sample is a transverse section containing the epidermis, dermis and hypodermis. The general structure has been preserved. The only noticeable lesion is the presence of extravasated red blood cells in the hypodermis, although there is no inflammatory reaction. The reaction to Prussian blue is negative.

# **Anatomopathological diagnosis**

## **1) Signs of violence against the neck**

- Groove which goes two thirds of the way around the neck, with an anterior section, situated in the middle third of the neck, which is wide and badly delimited, and narrower, parchment-like, more clearly delimited lateral sections, which disappear to the rear, with the virtual suspension point situated in the occipital region

- Haemorrhagic suffusion in the upper section of the anterior edge of the right sternocleidomastoid muscle

- Haemorrhagic suffusion of the fibrous-adipose tissue of the neck, situated just above the left mandibular angle

## **2) Other vital traumatic lesions**

- Injection/puncture marks surrounded by ecchymosis, one situated in the fold of the right elbow, the other on the back of the right hand

- Complete exarticulation of the first lower left incisor (tooth No. 31), with tearing of the gums and related haemorrhagic suffusion

- Recent chipping of the sharp edge of tooth No. 22

- Localised erythema in the sulcus relating to teeth Nos. 12, 11, 21, 22, suggesting signs of dental subluxation

- Fracture of the mesial angle of tooth No. 41, possibly associated with the exarticulation of tooth No. 31

## **3) Pre-existing lesions**

- Very slight signs of arteriosclerosis (bifurcation of carotid arteries, abdominal aorta)
- Old, slight perivascular haemorrhaging in the cerebral cortex

## **4) Lesions caused by post-mortem investigations**

- The body has been subjected to a post-mortem examination of the three cavities, with openings in the posterior face of the trunk, the posterior and anterior faces of the limbs, and several post-mortem incisions on the wrists and ankles

- Parts of organs or entire organs are either missing or non-identifiable: larynx, pharynx, thyroid cartilage, hyoid bone, upper section of the trachea, part of the musculature of the neck, cervical ganglions, oesophagus, renal lodges, mesentery, suprarenals, pancreas, gall bladder, prostate, testicles, appendix, pituitary gland

## 5) **Further observation**

- Post-mortem alteration has begun

University Institute of Legal Medicine

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH - 1005 Lausanne
Tél: 41 213147070 - Fax: 41213147090
E-mail: IUML.Central@hospvd.ch

Laboratory of forensic toxicology and chemistry

Lausanne, 29-06-2006

**Re:_____ File No. ALC 35502, Batch 764 Ahmed
ALI ABDULLAH, 09.03.1969**

We have carried out an ethylic alcohol dosage test on sample No. M0600113, in the name of Ahmed ALI ABDULLAH:

Sample type: Blood
Date of receipt: 26-06-2006
Date sample taken: 21-06-2006
Time sample taken:

Results

**Average alcohol level: 0.18 grams per thousand.** Confidence
interval: [0.13; 0.23] grams per thousand.

Note:

Dr. Marc Augsberger
Biologist, Toxicologist
Head of laboratory

Copy to: Prof Patrice Mangin, IUML, Rue du Bugnon 21, 1005 Lausanne

*This report deals only with the samples submitted for analysis. Details regarding the analysis methods used may be obtained on request.*

*The samples will be retained for a period of one year from the date of delivery of this report. After this date, the sample will be destroyed unless you advise us otherwise.*

*This report may not be partially reproduced. The use of individual results is authorised as long as the source is cited.*

University Institute of Legal Medicine

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH - 1005 Lausanne
Tél: 41 213147070 - Fax: 41213147090
E-mail: IUML.Central@hospvd.ch

Laboratory of forensic toxicology and chemistry

g)

Lausanne, 29-06-2006

**Re:_____ File No. ALC 35503, Batch 764 Ahmed ALI ABDULLAH, 09.03.1969**

We have carried out an ethylic alcohol dosage test on sample No. M0600113, in the name of Ahmed ALI ABDULLAH:

Sample type: Muscle
Date of receipt: 26-06-2006
Date sample taken: 21-06-2006
Time sample taken:

Results

**Average alcohol level: 0.13 grams per thousand.** Confidence interval: [0.08; 0.18] grams per thousand.

Note:

Copy to: Prof Patrice Mangin, IUML, Rue du Bugnon 21,1005 Lausanne

*This report deals only with the samples submitted for analysis. Details regarding the analysis methods used may be obtained on request.*

*The samples will be retained for a period of one year from the date of delivery of this report. After this date, the sample will be destroyed unless you advise us otherwise.*

*This report may not be partially reproduced. The use of individual results is authorised as long as the source is cited.*

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH - 1005 Lausanne
Tél: 41 213147070 - Fax: 41213147090
E-mail: IUML.Central@hospvd.ch

Laboratory of forensic toxicology and chemistry
Manager: Marc Augsburger, Dr ès Sc.

Professeur Patrice Mangin
Directeur de l'Institut Universitaire de
Médecine Légale
Rue du Bugnon 21
1005 Lausanne

Lausanne, 29th June 2006

**Re:**

**Analysis report TOX / 060626 - 35501**

**ALI ABDULLAH Ahmed, 1969**

**Systematic search for medical toxins and drugs
in biological samples**

## 1.      SAMPLES

On 26th June 2006, we received the following samples, taken during the course of autopsy M060113:

- 3 x approx. 5ml of fluoride blood from the thoracoabdominal cavity

- approx. 5ml of EDTA blood from the thoracoabdominal cavity

- samples of liver, kidney, skeletal muscle, cerebral cortex

- hair

## II.     RESULTS

### II.1. Preliminary tests

Results of the preliminary tests (immunological tests) carried out on the blood:

| Substance | Result | Cut-Off |
|---|---|---|
| Amphetamines | not detected | equivalent of 25ng d-amphetamine/ml |
| Barbiturates | not detected | equivalent of 20ng secobarbital/ml |
| Benzodiazepines | not detected | equivalent of 10ng oxazepam/ml |
| Buprenorphine | not detected | equivalent of 0.5ng buprenorphine/ml |
| Cannabis | not detected | equivalent of 5.0ng delta9-THC-9-carboxylic acid/ml |
| Cocaine | not detected | equivalent of 20ng benzoylecgonine/ml |
| LSD | not detected | equivalent of 1.0ng LSD/ml |
| Methadone | not detected | equivalent of 10ng methadone/ml |
| Opiates | not detected | equivalent of 10ng morphine/ml |

❑    Further preliminary test carried out on the blood:

cyanide             not detected

### II.2. Screenings, confirmations and dosages

The qualitative analyses carried out by CPG-SM searched for volatile and non-volatile basic, acidic and neutral toxins (mainly drugs, "designer drugs", poisons, pesticides, doping agents, solvents and other pollutants as well as their metabolites as mentioned in the libraries of Pfleger, Maurer and Weber (eds. 2000), Wiley7N, AAFS2000, NIST98 and IUML_Tox).

### II.2.1 Liver

❑    The qualitative analyses carried out by CPG-SM showed the presence of the following substances:
### - Caffeine and theobromine

### II.2.2. Blood

❑    The qualitative analyses carried out by CPG-SM did not find any evidence of the presence of the substances in question.

❑ The qualitative analyses carried out by HS-CPG-DIF showed the presence of the following substances (No. ALC-35502):

- **Ethanol**
- **Acetone**
- **- 1-Propanol**
- **- 2-Butanol**

❑ The qualitative analyses carried out by HS-CPG-DIF gave the following results (No. ALC-35502):

Ethanol                    0.18 g/kg (confidence interval: 0.13 – 0.23 g/kg)

### II.2.3. Muscle

❑ The qualitative analyses carried out by HS-CPG-DIF showed the presence of the following substances (No. ALC-35503):

- **Ethanol**
- **Acetone**
- **- 1-Propanol**
- **- 2-Butanol**

❑ The qualitative analyses carried out by HS-CPG-DIF gave the following results (No. ALC-35503):

Ethanol                    0.13 g/kg (confidence interval: 0.08 – 0.18 g/kg)

## III.     DISCUSSION

**Note**

Some of the substances found during the analyses, namely ethanol, acetone, 1-propanol and 2-butanol, may appear as a result of post-mortem alterations in the body.

## IV.   CONCLUSION

The analyses of the biological samples taken during autopsy M0600113 on **Ahmed ALI ABDULLAH (TOX-35501, ALC-35502 and ALC-35503)** indicate the presence, in the blood, of ethylic alcohol (ethanol), acetone, 1-propanol and 2-butanol. In the liver, there was evidence of caffeine and theobromine. In addition, there was found to be ethylic alcohol (ethanol) in the skeletal muscle.

Some of the substances found during the analyses, namely ethanol, acetone, 1-propanol and 2-butanol, may appear as a result of post-mortem alterations in the body.

*Taking into account the sensitivity limits of the analytical techniques used, the analyses of the principal biological samples provided did not demonstrate the presence of other toxins, drugs or medications in quantities that may be considered as significant on a toxicological scale. This report deals only with the samples submitted for analysis. Details regarding the analysis methods used and their margin of error may be obtained upon request. The samples will be retained for a period of 12 months from the date of delivery of this report. After this date, the sample will be destroyed unless you advise us otherwise. This report may not be partially reproduced. The use of individual results is authorised as long as the source is cited.*

University Institute of Legal Medicine

Directeur: Professeur Patrice Mangin

Rue du Bugnon 21, CH - 1005 Lausanne
Tél: 41 213147070 - Fax: 41213147090
E-mail: IUML.Central@hospvd.ch

Professor
Patrice Mangin
IUML

*N/Ref.* : *P06-00068 - cas*

Lausanne, 28th June 2006

**Re: Determination of the origin of a sample of blood through forensic genetic analysis**

Dear Professor,

On 26th June 2006, we received a sample of blood on FTA paper and a piece of muscle from the forensic medicine unit, which had been taken from a male body during autopsy M0600113.

It was our mission to establish and present the DNA profiles resulting from this material as well as to confirm the nature of the material under analysis.

We have fulfilled your request. You will find our report below.

*Material to be analysed*

On 23rd June 2006, we received a sample of blood on FTA paper and a piece of muscle taken from the body of ALI ABDULLAH Ahmed, born 09.03.1969 (autopsy M0600113).

*Methods*

The DNA was extracted from the samples then amplified through PCR (Polymerase Chain Reaction) using the PowerPlex16 (Promega) kit and following the manufacturer's instructions. This kit allows for the analysis of 15 independent genetic loci simultaneously as well as the determination of the gender of the person from whom the sample was taken (amelogenin). Finally, the genetic profile was obtained by analysing the previously amplified DNA using a capillary electrophoresis machine. The analyses were carried out twice in accordance with the Swiss Society of Legal Medicine. We also analysed the blood sample using the Seratec HemDirect test, which is an immunochromatographic test that can detect the presence of human or primate haemoglobin.

*Results*

The double analyses carried out at the University Institute of Legal Medicine in Lausanne gave identical profiles for the genetic markers examined. More specifically, the same male profile of 15 loci was obtained for the blood and the muscle taken from the body during autopsy M0600113. The Seatec HemDirect test gave a positive result, signifying that haemoglobin was detected.

*Conclusions*

The DNA profiles obtained for the blood and muscle taken from the body during autopsy M0600113 show the same genetic characteristics. The evidentiary value of this analytical result was evaluated according to the following two hypotheses:

> H1: the blood and the muscle both come from the body on which the autopsy was carried out
> H2: the blood and the muscle come from two unknown persons

The similarity between the samples, calculated according to the frequency of alleles in the Swiss population, is above 10,000,000, signifying that it is approximately 10,000,000 times more likely that that these profiles would be observed if the blood and muscle came from the body on which the autopsy was carried out than from two different persons.

**The results of our analyses therefore strongly support the hypothesis that the blood and muscle both come from the body on which autopsy M0600113 was carried out.**

C. SIMILI                                    V. CASTELLA

Biologist                                    Biologist, Dr ès Sc.

Important: this report is only valid for the sample provided for analysis and within the sensitivity limits of the analysis methods used. Details of these may be obtained on request.  This report may not be reproduced in part or in whole without the laboratory's written authorisation. A copy of this report will be retained by our institute for a period of at least five years. The remainder of the material will be retained for 1 year from the date of delivery of this report. After this date, the sample will be destroyed unless you advise us otherwise.

**UNIVERSITY INSTITUTE OF LEGAL MEDICINE**
**Medicolegal odontostomatology unit**
**rue du Bugnon 21**
**1005 LAUSANNE**

Lausanne, 27th June 2006

## REPORT OF THE ODONTOSTOMATOLOGICAL POST-MORTEM EXAMINATION BASED ON PHOTOGRAPHIC DOCUMENTS

Body **M0600113**

Reported identity: **Ahmed Ali Abdullah, 03.09.69**

**Examination requested by:** Prof. Patrice Mangin, Dr. Beat Horisberger, Dr. Bettina Schrag, legal medics

**Examination carried out by:** Dr Michel Perrier MER, consultant odontologist

**Date of the examination:** 27.06.06

**Photographic documents provided by:**

- Dr. Beat Horisberger and Dr. Bettina Schrag, legal medics

**Ante-mortem information:**

**Post-mortem sample:**

- 11 post-mortem photographs

## A. Observations

### 1. Maxillary

- horizontal lesion in the vermilion zone (approx. 1.5cm) located on the right hand side of the upper lip
- vestibular faces of the following teeth visible: 13, 12, 11, 21, 22, 23
- slight signs of gingivitis and discolouration

- normal gingival sulcus, in places (12, 11, 21, 22) showing erythema, which may be the result of traumatic dental subluxation
- the alveolar mucous is slightly hypertrophic
- no sign of paradontitis
- 22: sharp edge chipped (recent lesion given the neatness of the fracture)
- 23: evident erosion of the sharp edge

**2. Mandible:**

- vestibular faces of the following teeth visible: 33, 32, 41, 42, 43
- signs of gingivitis with discolouration and small tartar deposits
- no apparent sign of paradontitis
- 41: fracture of the mesial angle; difficult to evaluate how recently this event happened
- 31 : tooth completely removed (root may still remain, although is not visible), associated with localised tearing of the mucous which extends in a vestibular direction and beyond the mucogingival line with a gap in the tooth alveolus, with no signs of healing or granulation. The lesion suggests recent, violent dental trauma, probably in a vestibular direction (towards the exterior) with the apparent destruction of the external bony alveolar wall. It is possible that the fracture of the mesial angle of tooth 41 may be associated with this trauma. The available photographic documents do not provide enough evidence to support this hypothesis.


## B. Conclusions

Based solely on photographic documents, I, the undersigned, confirm the presence of recent trauma on the following teeth:

1. tooth 22: recent chipping of the sharp edge;
2. teeth 12, 11, 21, 22: localised sulcular erythema suggesting signs of dental subluxation;
3. tooth 31: traumatic exarticulation which, upon examination, appears to have happened just prior to death or near to the time of death;
4. tooth 41: fracture of the mesial angle, whish is difficult to place temporally, but may be associated with the exarticulation of tooth 31.

All of these observations were carried out on the basis of photographic documents alone. The lesions observed appear to be compatible with a traumatic event that happened just prior to death or near to the time of death.

Dr Michel Perrier
dental consultant

# Information provided by the organisation "Alkarama For Human Rights"

According to the information received by the organisation "Alkarama for Human Rights", on 10th June 2006, three people died in the Guantanamo detention camp, including Ahmed ALI ABDULLAH, a Yemeni national, and a further two Saudi nationals.

The organisation "Alkarama for Human Rights" was asked by the victim's family to help organise a second autopsy on the body, with the aim of discovering whether the suicide hypothesis could be confirmed or refuted.

With regard to Ahmed ALI ABDULLAH, the organisation has provided us with the following information: he had been detained at Guantanamo for 4 years. The family had had no contact with him. His parents had sent two letters, but received no reply. His father rejects the diagnosis of suicide put forward by the American authorities. In fact, suicide is prohibited by the Islamic religion and is therefore contrary to his son's religious convictions. In addition, another of his sons is still detained at Guantanamo.

With regard to the two Saudi inmates, we were informed that their bodies were also subject to an autopsy at the request of the Saudi authorities.

Dr. Saeed G. Al-Ghamdy, director of the Institute of Legal Medicine in Riyadh, informed us that he had already carried out the autopsies and that he had contacted the American authorities for further information, particularly surrounding the circumstances in which the bodies were discovered and the medical and medicolegal investigations carried out on site, before the bodies were returned to the families.

# **Discussion**

The discussion is based on the information received from the organisation "Alkarama for Human Rights", as well as on the results of the medicolegal investigations, and in particular the second medicolegal autopsy carried out by the team at the University Institute of Legal Medicine in Lausanne 11 days after death.

The second autopsy's principal result was to reveal signs of violence against the neck, which were as follows:

> - a groove encircling two thirds of the neck and rising towards the rear
> - haemorrhagic suffusion of the right sternocleidomastoid muscle
> - haemorrhagic suffusion of the fibrous-adipose tissue located just below the left mandibular angle.

In addition, we observed two injection/puncture marks with ecchymosis on the upper right limb (inner elbow and back of the hand), as well as the fresh exarticulation of the first left lower incisor with related haemorrhagic suffusion. These lesions are all vital, signifying that they were suffered whilst the individual was alive.

During the autopsy, we observed that the body in question had already undergone an autopsy, during which the three cavities, the dorsal face of the trunk and the anterior and posterior faces of the limbs were opened, the entrails were entirely removed and placed in a plastic bag except for some organs or parts of organs (see above), and organs and parts of organs were dissected.

Furthermore, it is important to stress the limitations of this medicolegal interpretation, partly as a result of the beginnings of post-mortem alteration, and partly as a result of the modifications caused by the first autopsy, which prevented us from taking a number of biological samples for toxicological analysis (notably peripheral blood and urine).  In addition, it was therefore impossible to examine certain organs or parts of organs such as the larynx and its skeleton.

On the basis of the elements currently available to us, the most likely cause of death is mechanical asphyxiation associated with violence against the neck. This asphyxiation is compatible with hanging, although this does not formally exclude other violent mechanisms (such as strangulation), either on their own or in combination with hanging.

The odontostomatological lesions observed, and the fresh exarticulation of the lower left incisor in particular, in conjunction with the absence of bruising to the lips, give cause to the need to access the American authorities' reports on this matter. The signs observed in situ suggest a traumatic origin and it is possible that they may be associated with a resuscitation attempt. They do not, however, suggest blunt trauma against the mouth region, which would cause other associated lesions (contused wound, ecchymosis).

With regard to the injection/puncture marks with ecchymosis observed on the upper right limb (inner elbow and back of the hand), there are three possible hypotheses:

1) the lesions were caused during a resuscitation attempt

2) the injection/puncture was carried out by a third party before death

3) the injection/puncture was carried out by the individual himself (a highly unlikely hypothesis)

It should be noted that the body was in a satisfactory state of nutrition and hygiene.

The forensic genetic analyses were able to establish that the brownish red liquid collected from the thoracoabdominal cavity is human blood and that it is from the body whose identity was given to us as ALI ABDULLAH Ahmed.

In the absence of peripheral blood, the toxicological analyses were carried out on the sample of blood collected from the thoracoabdominal cavities. The results of these analyses indicate the presence of ethylic alcohol in the blood at an average level of 0.18g/kg, as well as of acetone, 1-propanol and 2-butanol.  No other substance of medicolegal interest was present.  In all likelihood, these substances were produced as part of the post-mortem alteration process observed during the second autopsy. As a result, at the moment of death, the individual concerned was unlikely to have been under the influence of medication or drugs.

With regard to the circumstances of the death, it is necessary to raise a number of points requiring clarification:

the well delimited, narrow parts of the cervical groove (lateral sections) are not normally observed with the indicated cause of death (use of sheets and clothing as a means of hanging),

the haemorrhaging of the areas below the neck do not formally coincide with the observed groove on the skin,

There are other traumatic lesions besides those on the neck, especially the fresh exarticulation of the first lower left incisor and the presence of injection/puncture marks on the upper right limb, insofar as they are not consistent with a resuscitation attempt or self-injury.

At the current time, and subject to the element outline above, our investigations do not appear incompatible with the hypothesis of suicide by hanging, but do not exclude any other possibility outright. To this end, we sent a letter to the American authorities requesting additional information (see attached letter). To date we have not received the information requested. We reserve the right to reconsider our conclusions based on any further information we mat receive.

It is worth noting that our Saudi colleagues dealing with the second autopsy on the bodies of the other two detainees have also expressed the need to obtain further information along the same lines as our request.

Whatever the cause may be, we believe it necessary to evaluate the detention conditions. This is not, however, within the remit of medicolegal experts.

# **Conclusions**

1)     **The principal result of our investigations was to reveal signs of violence against the neck (groove, haemorrhaging of the muscles and fibrous-adipose tissue), two injection/puncture marks with ecchymosis on the upper right arm, and the fresh exarticulation of the first lower left incisor.**

2)     **The cause of death is, in all likelihood, the result of mechanical asphyxiation from violence against the neck compatible with hanging, although this does not formally exclude any other mechanism.**

3)     **The injection/puncture wounds with ecchymosis on the upper right limb and the dental trauma may be explained by a resuscitation attempt. However, they may represent an area of suspicion with regard to the circumstances of the death.**

4)     **The toxological analyses did not show evidence of any medication or drugs that may have interfered with the death or the circumstances leading to it.**

**5)      At the current stage of our investigations, and with the information at our disposal, subject to point 3, our observations are not incompatible with the hypothesis of suicide.**

**6)      Under this hypothesis, and taking into account the objections put forward by the family, there may be a case for questioning the role of the detention conditions in contributing to this act of self-injury.**

7)      **As of the date of this report, the information requested from the American authorities has not been received.**

We remain at your disposal should you require any further information.

Yours sincerely,

Dr. B. HORISBERGER                                    Professor P. MANGIN
Hospital doctor

Dr. B. SCHRAG
h)   Assistant doctor

Appendix: letter of 29th June 2006, sent by Mr. Rachid Mesli to Dr. Craig T. Mallak on the request of Professor Patrice Mangin





INTER - AMERICAN COMMISSION ON HUMAN RIGHTS
COMISION INTERAMERICANA DE DERECHOS HUMANOS
COMISSÃO INTERAMERICANA DE DIREITOS HUMANOS
COMMISSION INTERAMÉRICAINE DES DROITS DE L'HOMME

# ORGANIZATION OF AMERICAN STATES
WASHINGTON, D.C. 2 0 0 0 6 U.S.A.

June 12, 2006

RE :  **Detainees In Guantánamo Bay, Cuba**
      **Precautionary Measures N° 259**
      **United States**

Dear Mr. Ratner and Ms. Lahood:

On behalf of the Inter-American Commission on Human Rights, I write in respect of the situation of the individuals detained by the United States at Guantanamo Bay and who are the beneficiaries of the precautionary measures cited above.

The Commission has received information indicating that on June 10, 2006, three of the detainees held by the United States at Guantanamo Bay committed suicide. As a consequence, and in light of the terms of the Commission's precautionary measures addressing the humane treatment of the detainees, I wish to inform you that in a note of today's date the Commission has requested the United States to provide information concerning this situation within a period of 10 days.

Yours sincerely.

Santiago A. Canton
Executive Secretary

Michael Ratner and Maria Lahood
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012

6/12/2006-BT-5000259